JAMES McCALL, ET AL., *vs.* HINKLEY AND WOODWARD, GARNISHEES OF CAREY, ET AL.—*December* 1846.

A deed from the several partners of a firm in failing circumstances, for a nominal consideration, conveyed all their effects to trustees in trust:

1st. To take possession of and recover such estate; give acquittances, and compound and arbitrate all debts assigned; appoint agents and substitutes, and sell the estate recovered.

2nd. To pay and discharge the expenses of the trust.

3rd. To pay and satisfy a certain judgment mentioned in the deed against one of the partners, for a debt due by the firm in *New York*.

4th. To pay and satisfy all the small debts of the firm, under the sum of one hundred dollars.

5th. To pay the whole of the residue of the estate recovered, or so much thereof as might be necessary, to and amongst such of the creditors of the firm as should, within ninety days of the date of the deed, signify their

assent to the terms thereof, and execute and deliver to the grantors a full and final release and discharge of and from all claims, in manner following, to wit: 25 per cent. on account of merchandize purchased; then 25 per cent. on account of borrowed money and accommodation paper, and other confidential engagements of the firm; then the balance, principal and interest, of the releasing creditor's claims.

6th. If the funds prove more than sufficient for the above objects, the residue to be paid to the grantors.

Upon the prayer that the said deed is void in law, in that it gives an undue preference to one class of creditors, and requires all creditors who may partake of its benefits, to execute a general release to the grantor's debtors. The county court declared the deed to be valid; upon appeal, affirmed by a divided court.

APPEAL from *Baltimore* county court.

On the 22nd March 1841, the appellants sued out an attachment upon a judgment of that court, rendered in their favor, against *Carey, Wethered,* and *O'Donnell.*

The attachment was laid in the hands of the garnishees, who appeared and pleaded *nulla bona,* on which plea issue was joined.

EXCEPTION. At the trial of the cause the plaintiffs to support the issue on their part, offered in evidence the judgment rendered in this court on the 30th September 1840, as contained in the writ, and proved that the attachment in this case was issued on the 21st March 1841, and laid in the hands of *Edward Hinkley,* one of the garnishees in this case, on the 1st April 1841, and in the hands of *William Woodward,* the other of said garnishees, on the 7th of the same month; and that said garnishees had in their hands funds collected by them, as trustees, under and by virtue of a certain deed of trust, executed to them by the said *Carey, Wethered & Co.,* and delivered to, and accepted by, said trustees, on or about the day of its date, which deed is as follows:—

" This indenture, made this 24th September 1840, between *George Carey, George Y. Wethered,* and *John H. O'Donnell,* now, or late partners, trading under the firm of *Carey, Wethered and Company,* all of the city and county of *Baltimore,* of the first part, and *W. W.* and *E. H.,* of the same place, of the second part, witnesseth, that the said parties of the first part, partners as aforesaid, for and in consideration of the

17    v.4

sum of *ten dollars*, lawful money of the *United States*, to them in hand paid by the said parties of the second part, at or before the sealing and delivering of these presents, the receipt whereof is hereby acknowledged; and also for divers good causes, and other valuable considerations, them thereunto moving, have granted, bargained, &c., and do hereby grant, bargain, &c., unto the said parties of the second part, as joint tenants, all and singular, the real and personal estate, goods, &c.; of debts, claims and sums of money, due, payable or owing to the said *C., W. & Co.*, and the late firm of *C. & W.*, or to said firms, or either of them, in any wise coming, and all bonds, notes, vouchers, evidences and writings, touching and concerning the same; and all the right, title, interest, claim, demand, power and control whatsoever, of said parties of the first part, and each and every of them, of, in, unto, and out of, and over the same, to have and to hold, receive and take the same, and every part thereof, unto the said parties hereto of the second part; and the survivor of them, and the heirs, executors, administrators and assigns of such survivor; to execute the powers and trusts hereby intended to be reposed in them, the said parties of the first part have constituted and appointed, and by these presents do constitute and appoint the said parties of the second part, and the survivor of them, and the legal representatives of such survivor, to be the true and lawful attorneys, irrevocable of the said parties of the first part, and in their names, or in the name or names of any of them, or otherwise, as the case may require; but to the uses and purposes hereinafter declared, to collect, and by all lawful ways and means whatever, recover, receive, and get into the hands, custody and power of the said parties of the second part, all and singular, the estate, property, debts and claims, hereby conveyed and assigned, and every part thereof; and upon recovery and receipt thereof, good and sufficient acquittances and discharges therefor, in whole or in part, as the case may be, to give execute and deliver, and to compound for and settle, by arbitration or otherwise, all debts and claims so hereby assigned, or any part thereof, in such manner as the said trustees or trustee, and attorneys or attorney, shall think proper; and for all and every the purposes aforesaid,

one or more attorney or attorneys under them, the said trustees to substitute and appoint, and such appointment at pleasure to revoke, and reasonable compensation to such substitute or substitutes, to allow, and generally to do, perform and transact, all and whatsoever may be requisite in the premises, as fully and effectually as the said parties of the first part, or any of them, could or might do personally, if these presents had never been made; the said parties of the first part, and each of them, hereby agreeing, and binding themselves and himself, to ratify and confirm whatsoever the said parties of the second part, or the survivor of them, or the legal representatives of such survivor, shall or may lawfully do, or cause to be done, in the matters aforesaid, by virtue hereof, in trust and confidence nevertheless, and to, for, and upon the uses and trusts, and to the ends, intents and purposes, and under and subject to the powers, provisos, limitations, declarations and agreements, hereinafter mentioned, expressed and declared, of and concerning the said estate and property, and other the premises hereby granted and assigned; that is to say, in trust, that the said trustee shall and will, as soon as conveniently may be, dispose of the said estate and property hereby conveyed, by sale of the same, (which sale the said trustees or trustee, are, and is hereby authorised and empowered, to make, whenever, and in such manner as they or he shall think best and proper,) and collect the debts and claims hereby assigned and transferred, wherever the same may be; and upon the further trust, that the said trustees, or the survivor of them, or the legal representatives of the survivor, shall and will pay, apply and dispose of all the moneys that may be received or come to the hands of them, or either of them, or the legal representatives of the survivor of them, in manner following, that is to say: in the first place, may deduct therefrom the expenses attending the execution of this trust, including five per cent. commission to the trustees, and counsel and attorney's fees; in the second place, shall thereout pay and satisfy a certain judgment obtained in the city of *New York*, in the State of *New York*, by *Bankard* and *Hutton*, of said city, against said *George Carey*, for a debt due by said *Carey*, *Wethered and Company*, to said *B. & H.*,

on and for which the said *Carey* was, in July or August last, arrested by said plaintiffs in *New York*, aforesaid; on which arrest *John Coster*, of *Brooklyn*, State of *New York*, became bail for said *Carey;* and in case the said bail *Coster* has paid, or shall be compelled to pay and satisfy such judgment, then to pay and satisfy, and indemnify the said *Coster* therefor, in lieu of paying said plaintiffs as aforesaid; in the third place, shall pay and satisfy all the small debts of said *C.*, *W. & Co.*, of or under the sum of one hundred dollars, and after such deduction shall, in the next place, pay and appropriate the whole of the residue of such money, or so much thereof as may be necessary, to and amongst such of the creditors of the said *C.*, *W. & Co.*, as shall within ninety days from the date of this deed, signify their assent to the terms of this deed, and execute and deliver to the said parties of the first part, a full and final release and discharge, of and from all claims or demands, to the time of executing these presents, in manner following, that is to say, shall out of such residue, first, pay twenty-five per centum of the principal money of the debts due or owing to such creditor, so releasing as aforesaid, for goods and merchandise purchased by said *C.*, *W. & Co.;* and after such payment of twenty-five per cent., shall then pay to such creditor, so releasing as aforesaid, all borrowed money, accommodation notes, accommodation endorsements, and other confidential engagements of said *C.*, *W. & Co.*, to such creditors, so releasing as aforesaid, in full of principal and interest; and then out of the balance remaining, to pay in full, for principal and interest, the balances due and owing to such creditors, so releasing as aforesaid, for goods and merchandise purchased by said *C.*, *W. & Co.*, if the fund be sufficient therefor; but rateably and proportionally in the order aforesaid, if the fund be not sufficient to discharge the whole; and after the full satisfaction and discharge of all the aforegoing claims, and all interest thereon, out of the residue, if any, shall pay all other creditors of said *C.*, *W. & Co.*, in full, or in equal proportions, if the said residue be not sufficient to pay such other creditors in full; and in the last place, shall pay over the balance or surplus, if any, to the said parties of the first part, or their respective legal representatives, pro-

vided, that neither the said trustees, nor their representatives, shall in any manner be answerable for the acts of the other, but for his individual acts only; nor be accountable for any loss or diminution of said trust estate, except so far as the same may come to their hands respectively, or be lost by their or his wilful neglect. In testimony whereof, the said *George Carey*, *George Y. Wethered*, and *John H. O'Donnell*, have hereunto respectively set their hands and affixed their seals, on the day and year first herein written. GEO. CAREY,                (Seal.)

                                     GEO. Y. WETHERED,   (Seal.)

                                     J. H. O'DONNELL,       (Seal.)  "

This deed was regularly acknowledged and recorded in *Baltimore* county court.

The garnishees further to support the issue on their part, and to sustain said deed of trust as a *bona fide* and valid conveyance, gave in evidence by *George Carey*, a competent witness, that prior to the execution of said deed of trust, there were two or three meetings of creditors of said *C.*, *W. & Co.*, held in the city of *Baltimore*, the first of which was held in the month of *May*, and the others in the summer, probably in *July* 1840. At the first meeting *C.*, *W. & Co.*, made a proposition to pay, first, all borrowed money, and then, the residue to all other creditors; the plaintiffs never attended any of these meetings, or assented to said deed of trust. To this proposition some creditors objected; and at the second meeting another proposition was made, that had been suggested by some of the creditors, in the interval between the first and second meeting. This second proposition was in accordance with the terms expressed in the said deed of trust, and many of the creditors, at the second meeting, assented to the form of the deed, and signified that they would sign the release as therein required; and most of all the creditors did execute such release, within the period of ninety days after the execution of said deed of trust; and the garnishees then read in evidence the release so executed. "To all to whom these presents shall come: we," &c.

The garnishees further gave in evidence by said witness, *Carey*, that immediately after the execution of said deed of

trust, the said trustees took possession of the books, notes, bills and accounts of the said *C.*, *W. & Co.* That the said firm owed, altogether, about one hundred and ten thousand dollars: forty or fifty thousand of which amount had been secured before the said deed of trust was executed. The claims of creditors who did not execute the release, including the plaintiffs, (who refused within the ninety days to execute it,) amount to about ten thousand dollars. The trustees in said deed were appointed at the suggestion of *William E. Mayhew* and *Robert A. Taylor*, who were creditors, at a meeting of the creditors, which was numerously attended by creditors of both classes, business and confidential. That the said firm had no goods or merchandise when the said deed was executed. It had bills receivable and debts due on open account, chiefly from persons resident in the western country, including *Virginia* and *Tennessee*. That the said firm stopped payment in February 1840; that it never transacted any business after the execution of said deed of trust; neither of the partners had any individual property at the date of said deed of trust. That the said *C.*, *W. & O'D.*, all applied for the benefit of the insolvent laws of *Maryland*, *Carey* on the 12th January 1841, *Wethered* on the 7th August in the same year, and *O'Donnell* on 13th July 1841, and each of them obtained a final discharge upon such application. That no permanent trustee has been appointed upon such application.

The plaintiffs prayed the opinion and direction of the court to the jury, that the plaintiffs are entitled to recover in this attachment, notwithstanding the said deed of trust and releases given in pursuance thereof; and that said deed of trust is void in law, in that it gives an undue preference to one class of creditors, and requires all creditors who may partake of its benefits, to execute a general release to the debtor, *Carey*, *Wethered & Co.*, or for other reasons; which opinion and direction the county court, (Purviance, A. J.,) refused to give, and declared that the said deed of trust was valid. The plaintiffs excepted.

The plaintiffs prosecuted this appeal.

The cause was argued before Dorsey, Chambers, Magruder and Martin, J.

By MEREDITH for the appellants, and
By HINCKLEY for the appellees.

DORSEY, J., delivered his opinion, as follows :

The only question designed to be decided by this opinion, is that which arises on the deed of the 24th of September 1840, from *Carey, Wethered* and *O'Donnell*, to *Edward Hinkley* and *William Woodward*, whereby the grantors, being unable to pay their debts, and in failing circumstances, (in other words insolvent debtors,) conveyed all their property to the grantees, in trust, to sell and dispose of the same, and to apply the proceeds thereof, after deducting the expenses incident to the trust, to the full satisfaction and payment of the claims of certain enumerated creditors of the grantors; and, "in the next place, to pay and appropriate the whole of the residue of such money, or so much thereof as may be necessary, to and amongst such of the creditors of the said *Carey, Wethered and Company*, as shall, within ninety days from the date of this deed, signify their assent to the terms thereof, and execute and deliver to the said parties of the first part, (that is, the grantors,) a full and final release, and discharge, of and from all claims and demands, to the time of executing these presents, &c., and after the full satisfaction and discharge of all the aforegoing claims, and all interest thereon, out of the residue, if any, shall pay all other creditors of said *Carey, Wethered and Company.*"

Whether an assignment, made by a debtor in insolvent circumstances, of all his property, for the benefit of all his creditors, with a proviso, that each creditor assenting to receive a dividend under such conveyance, shall, within some specified reasonable time, release the debtor from his claim against him, is fraudulent and void, under the 13 *of Eliz.*, chap. 5, is a question on which, in the examination of the case before us, it is not intended to express any opinion. Believing that, even if the validity of such an assignment were conceded, such a concession would fall far short of removing the fraudulent imputations cast upon the assignment under our consideration.

Before proceeding to an examination of the authorities referred to, as bearing upon this subject, let us see how the case

would stand upon the broad principles of morality, law, and justice, apart from all adjudications, or expressions of opinion by courts of justice, or eminent jurists. And, first, what are the obligations imposed on the debtor, and what the rights conferred on the creditor, by the character in which they respectively stand to each other? Upon principles of morality, law and justice, debtors are bound to apply their present property, and their future earnings and acquirements, to the payment of their just debts; and creditors, upon the clearest principles of natural justice, and of law, (irrespective of our insolvent system,) have a right to pursue such property, earnings, and acquirements, until their claims be fully satisfied and paid. Of this inherent right of the creditor, unless relinquished by his consent, the debtor has no right to deprive him. All unjust and indirect means, used by a debtor, to extort from his creditor a surrender of such, his rights; all physical or moral coercion, resorted to by the debtor, to effect such a purpose, are fraudulent, as well at common law, as under the statute of *Eliz.*, against creditors, who, withholding their assent to such proceedings, are injured thereby. What is the nature? what was the design of the assignment before us? The answer is so unequivocally apparent upon its face, as to leave not a moment's doubt upon the subject in the mind of him who reads it. Its object was, by a species of moral duress, by indirect means, by a violation of the principles of natural justice and right, to place a portion of the creditors in a condition, whereby they were to be compelled to relinquish all claim to any part of the present property of their debtor, or to surrender all right to seek payment out of his future earnings and acquirements. The injustice and impropriety of such an effort, on the part of the debtor, must shock the moral sense of every man, and *its* fraudulent design and effects, in legal contemplation, upon the rights of those creditors who refuse to accede to its terms, cannot, by argument or illustration, be made more obvious.

It was admitted, in the discussion of this case, (and such is the principle established by a current of authorities,) that, if the assignment contain but a part of the property of the debtor; or if, before the full payment of the entire claims of the credi-

tors, any part of the property assigned be reserved to the debtor, such an assignment is fraudulent and void. Void against whom? Not against the creditors, who, knowing its provisions, have assented thereto, and released their claims. But void as against dissenting creditors. But why fraudulent and void as to them? Is the injustice visited upon them? Is the detriment to which they are subjected?—is the fraudulent hindrance and delay in the recovery of their claims, greater? Nay, are they not much less under such assignments, than they are under that, now for our consideration? Sanction the validity of the present assignment, and it is a fact conceded in this cause, and is practically true, as to almost every assignment containing a provision similar to that which forms the subject matter of the present controversy, that the dissenting creditors are utterly excluded from all participation in any part of the debtor's property owned at the time of the assignment. But what is the fraudulent injury sustained by a dissenting creditor in the aforementioned cases, in which the assignments are adjudged and admitted to be fraudulent, as against him? Unquestionably less than in the case now before us. He, in those cases, is left in the full enjoyment of his right to recover his claim out of the unassigned portion of his debtor's property, or out of that part of the property assigned, which was reserved to the debtor. And, yet, in *Massachusetts*, and, it is believed, everywhere else, where such assignments have been submitted to the cognizance of judicial tribunals, in reference to the statute of *Elizabeth,* they have been held fraudulent and void, as against dissenting creditors.

Assuming, then, as against dissentient creditors, the invalidity of the assignments, by reason of the requisition of releases from creditors, in those cases where but a part of the debtor's property is conveyed for the benefit of creditors, upon what possible ground can it be contended, that, as concerns dissenting creditors, assignments of the whole of the debtor's property, with such stipulations for releases, are not fraudulent and void? Is the nature of the transaction changed? Is it purified by the fact, that, in the latter case, the noncurring creditor is deprived of the whole of his debtor's property? whereas, in the former

case, he is only deprived of a part. Yet, to this result, you must necessarily arrive to draw a distinction between the two cases, favorably to the latter. If the extent of the wrong and injury sustained by the suffering party, could in anywise affect the nature and character of the transaction, it is surely much greater in such latter than in the former case. And it should be borne in mind, that, in most, if not all of the cases in which has been adjudged the invalidity of assignments of part of the debtor's property, with stipulations for releases by creditors receiving dividends under such deeds, all the property conveyed was not given to the assenting creditors, but their just dividends only. In those cases, therefore, there did not exist that strongest of all the *indicia* of legal fraud in such cases, and which exists in this case, to wit, a provision to operate, by way of fraudulent moral compulsion on the creditors, by which they are notified by their debtor, in language too plain to be misunderstood, that, willing or not willing, they must surrender rights secured to them by contract, law, and justice, or be excluded from all participation in the property owned by the debtor at the time of the assignment. To sustain the deed now under consideration, is to declare that such conduct of the debtor is free from all illegality or fraud towards dissenting creditors.

If the assenting creditors were the parties seeking to vacate an assignment, transferring only a portion of the debtor's property, because it did not embrace the whole of it ; such application would not be unsupported, by, at least, some show of reason and justice. But that a dissenting creditor should successfully assert, in a court of justice, the invalidity of an assignment, depriving him of only part of his debtor's property; and that he is entitled to no relief, where he is, by a like conveyance, deprived of all claim to any portion of his debtor's property, is certainly an anomaly in judicial proceedings; and rests upon reasons or principles, far beyond the ken of ordinary human intellects, nor can the distinction be satisfactorily accounted for upon any legitimate system of reasoning, which announces the validity, as against dissenting creditors, of an assignment of all a debtor's present property, with a stipulation for releases by creditors; and the invalidity of an assignment of

part of a debtor's property, with a stipulation for like releases. In contemplation of law, the fraudulent character of each instrument is the same: they differ only in the extent of the injury attempted to be inflicted by the fraudulent act of assignment.

Why is it that the assignments referred to, of a part of a debtor's property, or of the whole, with a reservation of a part, or some interest therein, to the debtors, with a stipulation for releases by creditors before their claims are fully paid, are held fraudulent and void as against dissenting creditors? It is because the creditor is required to release his entire debt, for but a dividend thereof; whilst the debtor is to be left in the full enjoyment of a portion of that, which, by the tenor of his contract, and the law of the land, ought to be applied to the payment of his debts. What is it, that was attempted to be effected by the assignment before us? Nothing more nor less than, by a partial payment, to obtain a full release; and to leave the debtor to the enjoyment of his future earnings and acquirements, which, by the terms of his contract, and the law of the land, he was as much bound to apply to the payment of his debts, as he was the " reserved interest or portion" of his, then, property. The assignment before us further contains this pregnant and conclusive evidence of a legally fraudulent intention, the announcement made to his creditors, by the execution of the assignment, that unless they assented to the terms thereof, they should be forever debarred from all interest in the property conveyed. The legal intendment of a fraudulent design, in each of the three cases, manifestly appears upon the face of the assignments:—It is to coerce the creditors to surrender their rights, upon the terms of injustice the debtor has seen fit to prescribe. Unless immorality be morality, and wrong and right be convertible terms, human ingenuity can make no discrimination in the legal character of the three transactions: and certainly not favorably to the last of the three cases. As well might it be contended, that, because in grand and petty larceny, the gain by the offenders, and the loss by the offended, is greater in the one case than in the other, they are not both larcenies. That in legal contemplation, they are entirely different: the one being right, and the other wrong.

In some of the *United States*, it has been determined, that if a debtor in failing circumstances, make an assignment of all his property, for the benefit of all his creditors, with a proviso, that each creditor on receiving his dividend shall release all claims against the debtor, such an assignment is fraudulent and void, as regards a dissenting creditor. And yet, how much less cause to complain has such a creditor, than the present appellants. There the dividend, designed to be applicable to the claim of a creditor, who is debarred from receiving it by reason of his rejection of the terms proffered by the assignment, by way of resulting trust, becomes the property of the debtor; and as such, may by law be made available to the payment of such creditor's claim, so that in effect he might receive, in common with all other creditors, his just proportion of the effects of his debtor.

As a circumstance shewing that nothing fraudulent was intended, we are referred to that part of the deed which provides, that after the full satisfaction and discharge of the claims of the creditors previously provided for, the residue, if any, shall be applied to the payment of the claims of all other creditors. This provision, regarding it in reference to all past experience, in relation to such conveyances, is rather a mockery, than a *bona fide* offer of any substantial benefit to dissenting creditors. The history of such conveyances, almost, if not altogether, without an exception, as might well be supposed, proves, that before the expiration of the limited period, creditors enough will be found assenting to the terms of the conveyance, to exhaust all the property assigned. And that such was the result in this case, was admitted by the appellee. And that such was the anticipation of the debtors, in executing this assignment, is manifest from the stringent provision it contains, in respect to the releases of creditors.

The provision of this assignment, as concerns releases by creditors, has been attempted to be justified as being nothing more than the giving of preferences to particular creditors, which, by the acknowledged principles of law, every debtor has a right to give. This provision cannot be supported on that ground. A debtor may, by a transfer of property, prefer

one creditor, or class of creditors, to another: but it must be done *bona fide*, for the purpose of conferring a benefit on the creditor; not of securing a benefit to the debtor. The privileges cannot be exerted, as in this case, as a device contrived for the purpose of obtaining a benefit to the debtor, by imposing on his creditors, what, in law, cannot be otherwise regarded, than as a fraudulent moral coercion, practised upon them, to induce an unwilling surrender to him of their just rights.

To sanction such a deed as this, would be to annihilate the just and salutary principles of the insolvent laws, in almost every instance, in respect to all insolvents who are possessed of property to any considerable extent. Every such debtor will dictate his own terms to his creditors, and make for himself his own insolvent law. Let it be once announced that courts of justice will sustain such conveyances, and thenceforth there will be no dissenting creditors. All your numerous acts of legislation, designed to prevent and vacate undue preferences and to secure the equal distribution of the estates of insolvents, amongst all their creditors, will be virtually repealed. There will be no dissentient creditor, who, driving the debtor to peti-tion for an insolvent's discharge, will, through his trustee, seek to vacate such a conveyance. But suppose a creditor, indig-nant at the insult and injustice with which he had been treated, should refuse to accede to the terms of the assignment, and having driven the debtor to seek the benefit of the insolvent laws, should call on the trustee to proceed in a court of law or equity, to vacate such a conveyance: what imaginable benefit could he anticipate from such a proceeding? The trustee receiving nothing from the insolvent's estate, the creditor must secure, or advance to him, all the expenses of the litigation. And what must be the, almost, inevitable result of such a con-troversy?—Why, the debtor will appear in court, and swear, as well he might, that he expected all his creditors would have come in under the assignment; and that, at the time of execut-ing the same, he had no intent or expectation of being or be-coming an insolvent petitioner. The necessary consequence of which would be, that the trustee is dismissed from court, and the dissenting creditor must pay all the expenses of the fruitless litigation.

By giving validity to such deeds as that now before us, an unjust and odious discrimination, in the inverse ratio of their merits, is created between two classes of insolvent debtors. The one having property, and withholding it from their creditors as long as the law's delays will allow: the other honestly appropriating their means and earnings to the payment of their just debts, are ultimately driven to the necessity of becoming insolvent petitioners, with little or nothing to surrender for the benefit of their creditors. The former class are virtually permitted, severally, to pass insolvent laws for themselves; to prescribe the terms of their own discharges, and to exempt from the pursuit of their creditors their subsequent acquirements, by gift, devise, descent, or in the course of distribution. Whilst the latter, and more meritorious class, can only obtain their discharges under the general insolvent laws of the State, and must leave, subject to the claims of their creditors, whatever they may subsequently acquire by way of gift, devise, descent, or in the course of distribution.

But it is urged, that conveyances like the present have been so long used, and have been of such frequent occurrence in this State, without objection, that to shake their validity would be productive of most mischievous consequences. Without stopping to enquire, whether such assignments are not much less numerous?—their results much less serious in reality, than in imagination?—whether the statute of repose, as it is called, be not an adequate remedy for most of the apprehended mischiefs?—whether the frequent occurrence, (if it be so,) of such assignments, without objection, results not rather from the fact that all the creditors assented thereto, than from any acquiescence, by dissenting creditors, in the validity thereof?—can any precedents be found, where courts of justice, for such a reason, have sanctioned proceedings which have been concocted in fraud, and are in direct violation of the statute law of the land? It is believed not. Due respect and indulgence have been shewn to popular errors, in the adoption of the trite maxim, that "*communis error facit jus.*" But that axiom has never been applied to a case like the present, and he would be a bold jurist, and the advocate of a new code of morality, who

would assert, that " *communis fraus et violatio legis faciunt jus.*" And to that length must the maxim be extended, to support the conveyance, the validity of which is based upon it. That a model of such an assignment as that now before us, could have been substituted for the old and common form of a deed of composition, is strange indeed. And it can only be accounted for, by supposing it to be, the cunningly devised invention of him, who, in stretching his ingenuity to rescue the debtor from the power and rights of the creditor, lost sight of the principles both of law and morality. Common usage or custom may explain or change the nature of a contract; or the liabilities or rights of the parties thereto. But no such custom is of any validity; it being in its origin and character, unjust and unreasonable, and in contravention of the statutory enactment on the subject.

Having thus far endeavored to shew what ought to be the decision of this case, upon the general principles of reason, law, and justice, applicable to its determination, let us next enquire how far the results, which have been thence obtained, are controlled by the authorities upon the subject. And first let us examine the adjudications in *England*, relied on in the argument for the appellee, as decisions of the question before us. But two of them have any bearing upon it. The first is that of *Pickstock vs. Lysters,* 3 *Maule and Selw.,* 371, where a debtor being in insolvent circumstances, to prevent one creditor from laying an execution upon it, conveyed all his property by a general assignment, to trustees, for the benefit of all his creditors, without giving any preference to any one of them; or imposing any condition, by which any creditor was to be excluded from an equal participation with other creditors, under the deed. In that case *Lord Ellenborough* says: " the act arises out of a discharge of the moral duties attached to his character of debtor, to make the fund available for the whole body of creditors. * * * I see no fraud; the deed was for the fair purpose of distribution." And *Bayley, Justice,* in delivering his opinion, says: " and this creditor is not excluded by the deed; but will stand, to all intents and purposes, in the same situation with all the rest of the creditors." *La Blanc, Justice,* says:

"this was not a deed, by which the party stipulated for a *bene-fit* to himself; but all the property of the party is fairly to be distributed amongst his creditors." The design and operation of the assignment in *Pickstock vs. Lyster*, being wholly dissimilar, the judgment of the court upon it, can give no sanction to the conveyance before us; but, according to the reasoning of the judges, is a clear authority against it.

The remaining case is that of *The King vs. Watson and another*, 1 *Exchequer Rep.*, 265, where, upon demurrer, the question did properly arise, whether an assignment of all the property of *Wheeler*, an insolvent debtor, in trust for the benefit of all his creditors, with a proviso, "that in consideration of such assignment they should take the same, and the moneys to arise therefrom, in full satisfaction and discharge of their several and respective debts, then due and owing to them, and release the said *Wheeler* therefrom," was fraudulent? In favor of the demurrer, that is, of the validity of such an assignment, *Pickstock vs. Lyster* was the only case referred to by the counsel: in which case it appears, that the assignment was general, for the benefit of all the creditors; and without any stipulation or provision therein, for the release of the debtor from the claims of all creditors receiving their distributive portions of the trust funds. By such an assignment as that, no fraud or injustice was done to any of the creditors, they being required to surrender no right, and the debtor reserving nothing to himself; no benefit not conferred on him by the most extended construction of his legal liabilities. The counsel opposed to the demurrer, and asserting the invalidity of the deed, in *The King vs. Watson and another*, does, it is true, say, that the assignment was fraudulent under the statute of 13 *Eliz.*, "from the fact of there being inserted in the assignment, a condition, to be imposed on all, who should entitle themselves to benefit under it, by signing it, that they should release the debtor from the rest of their demands, in consideration of such dividend as they should receive." That, therefore, if the deed was not *ipso facto*, void, it was voidable by him as delaying the recovery of his debt; and also operating to compel him to accede to a composition, which the bankrupt

laws could not force him to submit to;" and, "that the non-assent of some of the creditors to a deed of assignment, renders it fraudulent and void, was decided in *Eckardt vs. Wilson*, 8 *T. R.*, 148." As to which, *Baron Graham* observed, "in that case there was an actual commission of bankrupt taken out." After such a mere statement of points, (for argument it can scarcely be called,) the opinion of the court is thus laconically delivered : "There is certainly no fraud in this case, affecting the assignment which has been made for the equal benefit of all the creditors, *Braddock*, as well as the rest. Nor is any such inference to be drawn from the facts averred in the replication. It would have been a different thing if there had been a commission of bankrupt sued out, and the property had been divested. This is a very common arrangement, which it would be injurious to disturb, where there has been no commission." It is not a matter of surprise, that *Justice Sutherland* should regard the case of *The King vs. Watson and another*, as a very bald one, and entitled to very little weight as authority.

By this case, of *The King vs. Watson and another*, it is asserted by the counsel for the appellee, that the validity of such an assignment as that now before this court, has, in *England*, been conclusively established. If this assertion were well founded, it would certainly have its weight in the determination of the case before us. But, for this assertion, there is no sufficient foundation. In the assignment in the case of *The King vs. Watson and another*, there was wanting that provision which unequivocally impresses the stamp of fraud on the assignment in the case before us, viz., that the whole property of the debtor should be divided amongst such only of the creditors as should release their demands against him. In the case referred to, the property assigned was for the benefit of all the creditors, each of whom was required, to entitle him to his dividend, to give a release in full to his debtor. But the amount of dividend to be received by any creditor who acceded to the terms of the assignment, was identically the same, whether he alone, or all of the creditors, consented to conform to the conditions of the assignment. Upon no contingency could any creditor

19     v.4

receive more than his just proportion, upon an equal distribution of the property of the debtor amongst all his creditors. The dividends of those creditors, who rejected the terms proffered by the assignment, upon the principles of a resulting trust, became the property of the debtor, and as such could be pursued by the rejecting creditors. All that was there decided was, that the hindrance and delay to creditors, produced by the assignment, did not avoid it; and that it was not vitiated by the requisition, that the creditors participating in the benefits which it conferred, should release their claims. It left open to a dissenting creditor the means of recovering, from the effects of his debtor, the same *pro rata* amount which was received by the assenting creditor. It violated not, therefore, in that respect the rule of equity and justice, equality amongst creditors in the distribution of the estate of the debtor. But above all, it imposed no unjust moral compulsion on the creditor to surrender rights, with which he was unwilling to part. In that case the residue, in the hands of the trustees, was not, as here, to be divided between those who should release their claims, but between all the creditors, each creditor receiving his dividend to release the debtor.

Believing the question now before us never to have been decided in *England,* how does it stand affected by *American* decisions, is our next inquiry? Three of the cases relied on by the appellee, relate to the construction of a statute of the State of *Pennsylvania,* (which, as regards the present question, differs not from the 13 *of Eliz.,* chap. 5,) and to transactions originating there, and subject to the *lex loci contractus.* And the first to which we are referred, is that of *Pierpoint and Lord, vs. Graham,* 4 *Wash. C. C. R.,* 232. There the same question was presented for adjudication with that now before us. But the grounds upon which, in that case, the court's opinion is based, on the question as to the validity of the assignment, by reason of its benefits being exclusively confined to such creditors as should, within sixty days from its date, release their demands against the assigning debtors, are any thing but satisfactory. The learned judge, after stating that such a deed would be void, if no time, or an unreasonable time were

prescribed for the execution of the releases, thus proceeds: "but where a reasonable time is limited, within which the trust property is to vest in those, in whom the beneficial interest is intended, or will be relieved from the operation of the assignment, I can perceive no reason for imputing fraud to such a transaction. It is true, that during that period the property is, or may be protected from the claims of creditors: but is so protected for the benefit of those very creditors, and consequently, for an honest purpose. It cannot, in short, be said to be made with intention to defraud or delay creditors, when its professed object is, to put it in the power of the creditors to accept or to reject the benefit intended them; and in the latter case to leave the property subject to their rights, in like manner as it would have been, had the assignment not been made."

Such a view of the question presented to the consideration of the court, is neither sound nor practical; and makes the solution of the question depend on the mere delay to the creditors: which deserved not to be regarded as an ingredient in the fraud, imputable to the assignment. It was not to be complained of, as fraudulent, because creditors were delayed or hindered for the space of sixty days, in the prosecution of their claims, but because, by an ingeniously devised proviso in the assignment, the debtor has practically placed all the property he owned in a situation, in which he, in truth, says to his creditors, unless you release to me, that to which in justice and according to the obligation of my contracts, and the laws of the land, you are entitled, such of you as refuse to do so, shall receive no part of the property that I owned, and which ought to have been applied to the payment of your debts. That such would be the intention of the debtor in executing such an assignment; that such must be its effect and operation, no man, who reflects upon the subject, or is at all acquainted with such transactions, can for one moment doubt. View it in any other light, and instead of the stringent coercion and fraudulent aspect which it has assumed, it will become a mere proffered deed of composition between the debtor and his creditors, and from the reasons which are assigned for his decision, in that light only was it regarded by the learned judge. He says, it cannot, in short,

be said to be made with intention to defraud or delay creditors, when its professed object is to put it in the power of the creditors to accept or to reject the benefit intended them; and in the latter case, to leave the property subject to their rights, in like manner as it would have been had the assignment not been made.'' Had such been the object, and natural result and operation of the assignment, the soundness of the judge's reasoning could not have been controverted. But the manifest design and effect of the assignment is wholly misconceived in such an interpretation of it. He appears to have looked at it as if it were the offer of a benefit to creditors, to be accepted by all or none of them. Nothing could be further from the true interpretation and clearly expressed intent of the assignment. The opinion of the judge, as manifestly appears by his reasoning, was given on the assignment, where all the creditors should have accepted or all should have rejected, its stipulated terms. In the first branch of this alternative, there could be no fraud perpetrated injuriously against the rights of any creditor, upon the principle of "*volenti non fit injuria:*" in effect the transaction would then become a composition between debtor and creditors, of the validity of which there cannot be a doubt. On the second branch of the alternative, all that was determined was, that it was no such hindrance or delay of creditors, as under the statute of 13 *Eliz.*, *chap.* 5, would render it fraudulent and void. Whether such an assignment as that before the court, in *Pierpoint and Lord, vs. Graham*, where part of the creditors accepted and part of them rejected the terms prescribed, was, in that case, fraudulent and void, was a question which the reasoning of the learned judge demonstrates, was not in his contemplation when delivering his opinion, and was not considered or determined by him. The case, therefore, cannot be regarded as an authority of any weight in the determination of the question now before us.

The next case is that of *Lippincott vs. Barker*, 2 *Binney*, 174, which presents the same question as that submitted for our decision; but the strong ingredient of fraud, the principle of coercion and exclusion, was never noticed by the counsel who argued the case. It is true, *Chief Justice Tilghman* does

briefly mention the exclusion of creditors as an objection to the deed, but he refers more strongly to the requirement of the release by the debtor; and after an examination of the facts in the case, (amongst which was the assent of all the creditors, but two or three, before the execution of the assignment,) he thus concludes his opinion. "I beg, however, to be distinctly understood, that my opinion is confined to the circumstances of the present case, for there are many and strong objections to deeds of assignment, made without the privity of creditors, and excluding all who do not execute releases." *Justice Yeates* delivers his opinion in the case, sustaining the deed without the expression of any such reservation as was made by the *Chief Justice*. But *Justice Breckenridge* gives his opinion, which is both able and eloquent, pronouncing the deed to be fraudulent and void. Looking to the dissenting opinion of *Breckenridge, J.*, and the qualification attached to his opinion by *C. J. Tilghman*, it may well be questioned, whether the validity of such a deed as that now before us, has, by the two cases referred to, been definitively settled in the State of *Pennsylvania*.

The third case is that of *Brashaer vs. West and others*, 7 *Peters*, 608; and is said, by the counsel of the appellee, to be decisive of the present question. But the decision in that case is productive of no such result, nor are its facts such as they are regarded by the counsel for the appellee. The case was decided, not upon the ground that either upon reason or principle the decision below could be sustained, but that the assignment being made in *Philadelphia*, and its validity depending on a statute of *Pennsylvania*, the construction of which, the Supreme Court supposed, had been settled in that State, by the case of *Lippincott and Annesly vs. Barker*, 2 *Binney*, 174, and therefore said, "but whatever may be the intrinsic weight of this objection, it seems not to have prevailed in *Pennsylvania*. The construction which the courts of that State have put upon a *Pennsylvania* statute of frauds, must be received in the courts of the *United States*." And immediately preceding this extracted passage from the opinion of the Supreme Court, *Chief Justice Marshall*, by whom it was delivered, says,

"yet we are far from being satisfied that, upon general principles, such a deed ought to be sustained." In *Maryland*, then, where, (as was said by both parties litigant here,) the question on the 13 *of Eliz.*, now before us, has, for the first time, so arisen, as to render its decision indispensable, and which must, therefore, be decided as well upon general principles as authority: the case of *Brashear vs. West and another*, is rather to be regarded as of weight against the doctrines contended for by the appellees, than in their favor. And the same remarks applies with equal force, and for a like reason to the case of *Halsey et al., vs. Whitney et al., in 4 Mason*, 206, hereafter to be remarked on. But suppose the case of *Brashear vs. West and others*, not to have been decided, as in fact it was, upon the local law of *Pennsylvania*, but upon general principles, it would not then, as was asserted, be a decision upon the very question now before this court, because the facts are essentially variant in the two cases. In that before us it is conceded, that the assignment being made for the benefit of such creditors as should release their claims, the appellant, the recusant creditor, can receive nothing from the property assigned. In the case of *Brashear vs. West and others*, the releasing creditors were not entitled to the whole property assigned, but to such dividends only as they would have been entitled to had all the creditors consented to come in, and had complied with the terms of the conveyance. The dividends to which the dissentient creditors, if assenting, would have been entitled upon the principle of resulting trusts, became the property of the debtor, out of which, in the race of diligence with other dissenting creditors, if any, any one of them might have recovered the full amount of his claim, or as much thereof as he would have been entitled to, had the assignment been made for the general benefit of all the creditors, without the requirement of any releases. That an assignment, without such requisition, for the general benefit of all creditors, would be good, it cannot be necessary to cite authorities.

To prove that the same principle prevails in *Massachusetts* that, it is alleged, has been established in *Pennsylvania*, the case of *Halsey et al., vs. Whitney et al.,* 4 *Mason*, 206, de-

cided by *Justice Story*, is relied on as of paramount authority: the question there being identical with that now under consideration. The learned justice, after a very extended examination of various adjudications, in none of which was the precise point adjudicated, which he was then called on to determine, proceeded to state the grounds on which his judgment was about to be pronounced, as follows: "The decisions in *Massachusetts*, therefore, leave the question *in equilibrio*. But when we take into consideration the great length of time during which stipulations of this nature have prevailed in this State, without objection, there is much reason to believe, that the profession have deemed the law settled in favor of the debtor on this point. Then, on the other hand, in *Lippincott vs. Barker*, 2 *Binney*, 174, where the direct point arose, it was settled, that a stipulation for a release was not fraudulent. The reasoning of the court is limited, indeed, to the circumstances of the particular case, but it would be difficult not to perceive, that it naturally reaches further. I find also that my brother, *Mr. Justice Washington*, in *Pierpoint vs. Lord*, in 1820, is reported to have held, that an assignment, in trust for the benefit of such creditors as should release their debts, is founded upon a sufficient consideration in law. The case is not in point, but it was probably decided on the general principle. There is, however, a case in *England* directly in point. It is *The King in aid of Braddock, vs. Watson*, 3 *Price*, 6, where the very exception was taken by counsel, and the assignment was held to be good by the *Court of Exchequer*, against the claim of the crown itself. The weight of authority is then in favor of the stipulation, for the decision in *New York* did not turn upon the naked point of a release, but upon that as incorporated into a peculiar trust. I am free to say, that if the question were entirely new, and many estates had not passed on the faith of such assignments, the strong inclination of my mind would be against the validity of them. As it is, I yield without reluctance, to what seems the tone of authority in favor of them. If the result had been different, this assignment would have been void in toto, for it could not, where the fraud was apparent on the face of the deed, be good in favor of any of the credi

tors who had signed it.  They must, under the circumstances, be deemed cognizant of, and participators in, the unlawful object."

In commenting on the case of *King vs. Watson*, 1 *Exchequer Rep.*, 265, which is the same case referred to by *Justice Story*, as *Braddock vs. Watson*, 3 *Price*, 6, it was attempted to be shewn, and it is believed not unsuccessfully, that the same question now before us, did not, and could not arise in that case.  From it, therefore, his decision can derive but little support; and by the other authorities it is but feebly sustained.  The learned justice, after stating, that if the question were a new one, his own opinion would be against the validity of the deed, and that the decisions in *Massachusetts* were *in equilibrio* upon the subject, seeming to feel that the opinion he was pronouncing, stood in need of all the aid he could invoke, to its support, states: " but when we take into consideration the great length of time, during which stipulations of this nature have prevailed in this State, without objection, there is much reason to believe, that the profession have deemed the law settled in favor of the debtor on this point."  Had *Justice Story* reflected upon the nature and object of the assignment before him; the designs of its inventor, and its potency for their accomplishment; he would have been able to have given a much more satisfactory reason than he did, for " the great length of time, during which stipulations of this nature have prevailed" in *Massachusetts*.  By the execution of such assignments, debtors but surrendered what their creditors could, without their consent, have taken from them; and that too, without condition or stipulation.  The stipulations in the assignment were, if assented to, of great value and importance to the debtors.  If dissented from, their condition was no worse than before the assignments were executed.  Both they and their creditors well knew, or must be assumed to have known, that neither the validity or invalidity of such assignments was a matter of legal certainty: that to say the least of it, there was a doubt upon the subject.  And of this the natural consequence was, the prevailing, continuing execution of such instruments.  By them the debtors had every thing to

gain and nothing to lose. And the fears of creditors, on which it was the object and intention of such conveyances to operate, were sufficiently powerful in most cases to induce the acceptance of the proffered stipulations. As a matter of course then, the prevalence of such assignments would continue, until their invalidity was judicially determined. On this theory, the long continued practice of making such assignments, is much more truly and rationally accounted for, than by the assumption of *Justice Story*, "that the profession have deemed the law settled in favor of the debtor on this point." On what grounds he drew the inference, that no objection had been made to such stipulations, prevailing for so great a length of time, we have not the means of ascertaining. But it is somewhat difficult to understand, how the judicial decisions of the State should have left "the question *in equilibrio*," if there never had been, with the profession, an objection or doubt as to the validity of such stipulations. If, as was asserted, there never had been an objection by the profession to such stipulations, how could there have been decisions upon the subject, which should "leave the question *in equilibrio?*" Referring to the law reporters of that State, we find them long before, and about the time of the decision in 4 *Mason*, and long afterwards, filled with cases, in which objections to the validity of such stipulations, were the matters in controversy, and for decision by the court. And that in many, nay, most of the cases, the stipulations were far less objectionable, than those in the assignment before *Justice Story;* and that now before this court. And that many of those cases were conducted by members of "the profession," who stood amongst the foremost at the bar of that State. Viewing the case in 4 *Mason*, therefore, as it must here be regarded, it cannot be entitled to much additional weight, from its alleged conformity to the settled opinion of "the profession" in *Massachusetts*.

But it is alleged, that whatever doubts may have once existed in *Massachusetts*, the question is now definitively settled, in favor of the validity of such a deed as that now before us. And as authority for this, the case of *Nostrand vs. Atwood*, 19 *Pick.*, 281, has been cited. The allegation as to this case, is

20    v.4

unsustained by its examination. It was determined upon a distinct and independent ground, and leaves the question, now before us, wholly undecided; as is manifest from the following extract from the court's opinion : "In the view we have taken of the present case, it is wholly unnecessary to consider those various adjudications, or to pronounce any opinion upon the abstract question, of the effect of the introduction into an assignment of a stipulation for a release by the creditors, who became parties to it, in a case where such a stipulation might be prejudicial to a creditor, indisposed to assent thereto, and who might thus be deprived of receiving his share of the fruits of the assignments."

It has been stated, on the part of the appellees, that the validity of such an assignment, as that now before this court, was established in the State of *Maine*, by the case of *Fox vs. Adams et al*, 5 *Greenleaf's Rep.*, 345. But in that case the question was not decided: the deed having been adjudged to be invalid on other grounds.

It is believed that the only State in the Union, in which the validity of such a deed as that now before us, can be regarded as having been adjudicated, is the State of *Pennsylvania*. Whilst the invalidity of such conveyances has been conclusively settled in *Maine, Connecticut, New York, Ohio,* and *Missouri*: and that too, after a most thorough and learned examination and consideration of the subject. For which, see *Lord vs. The Brig Watchman*, 8 *American Jurist*, 284. *Ingraham vs. Wheeler*, 6 *Conn.*, 277. *Armstrong vs. Byrne and others*, 1 *Edward's C. R.*, 79. *Mills and others, vs. Levy and others*, 2 *Edward's C. R.*, 183. *Grover vs. Wakeman*, 11 *Wendell*, 187. *Atkinson and Rollins vs. Jordan and others*, 5 *Ohio Rep.* 293. And *Brown vs. Knox*, 6 *Missouri Rep.* 302. That the uncontrolled opinions of *Chief Justice Marshall*, and *Justice Story*, were in accordance with these decisions, is clearly shewn by the cases hereinbefore referred to in 7 *Peters*, and 4 *Mason*.

The sound and sensible doctrine upon this subject, as applicable to the case before us, was settled by the case in 11 *Wendell*, where it was held, "that a debtor, in failing circumstan-

ces, might, by assignment of his property in trust, prefer one creditor, or set of creditors, to another, provided he devote the whole of his property assigned to the payment of his just debts, and the assignment be absolute and unconditional, without any reservation or condition for his benefit; without extorting from the fears and apprehensions of his creditors, or any of them, an absolute discharge as a consideration for a partial dividend, or making the preferences, or any of them, to depend on the execution of a release by such preferred creditors to him, of all claims against him. An assignment, giving preferences upon such a condition, is void; and the assignment being void in part, as against creditors, and the provision of the statute, is void in toto, though there be no fraud in fact, intended."

It may not be amiss to notice, that if by judicial decisions in *Massachusetts* and *Pennsylvania*, such assignments, as that now before us, may, as has been contended, formerly have been sanctioned; the legislatures of those States have, by positive enactment, removed all doubt as to the invalidity of such instruments, subsequently executed. See *Massachusetts Statutes of* 1836, *chap.* 238; and *Laws of Pennsylvania of* 1843, *No.* 131, *page* 273.

Will the judiciary of *Maryland*, now, for the first time, acting upon the subject, and not constrained to do wrong against its conviction of right, at this time of day, give countenance to conveyances which every State in the union, where they have been definitively acted upon, have, legislatively or judicially, exploded as unjust or fraudulent against creditors? It should not be so.

Whilst insolvents, whose conduct merits kindness and protection, will ever be treated accordingly by courts of justice, in doing so it should not be forgotten, that creditors have rights, which it is an equal duty to protect. And whilst those tribunals should legitimately exert all the powers they possess, to protect debtors from the oppression and persecution of creditors, they should vigilantly guard against that over-weening, dangerous sympathy, which would lead them to sanction unjust and fraudulent designs of debtors towards their creditors.

Dissenting from the county court's refusal to grant the appellants prayer; and from its opinion, as expressed to the jury; I think its judgment should be reversed, and a procedendo awarded.

MARTIN, J., concurred with DORSEY, J.

MAGRUDER, J., delivered the following opinion :

This appeal is taken from a judgment of *Baltimore* county court. The record contains but one exception, and that exception presents but this one question. Did the plaintiff show a right to impeach the validity of the deed on which the defendants relied, as evidence of their title to the property in controversy? The court below said that he did not, and the verdict in consequence being for the defendants, we are now to decide whether the plaintiff can complain of that decision?

The case was this: On the 24th September 1840, *George Carey and others* executed a deed of trust to the appellees, thereby transferring to them property of which the possession was delivered, for the declared purpose of paying their creditors. By the provisions of the deed, some of the creditors are to have a preference, all others are to be paid so far as the trust funds will enable the trustees to pay them, provided within ninety days from the date of the deed, such creditors shall execute and deliver to their debtors a full and final release, and discharge from their claims. Nothing is reserved to the debtors, unless there be a surplus after discharging all claims against them. The grantors, who had been engaged in trade, had, some months previously to the execution of this deed, stopped payment, and not long after its execution took the benefit of the insolvent laws, and obtained a final discharge.

The appellants, acknowledged creditors of the firm, refused to accede to the terms of the deed, to which many of the creditors had agreed, and on the 22nd March 1841, sued out of *Baltimore* county court an attachment, upon a judgment which they had obtained against the insolvent firm. This attachment was laid in the hands of the appellees, (the trustees in the deed,) the appellants insisting, that the deed of trust was, as against them, void, and that their attachment, and the service

of it, as stated, gave to them a right to be paid the amount of their judgment, out of the effects which the deed had placed in the hands of the garnishees. This claim, of course, was inadmissible, if the deed was valid, and thus the question arises.

It cannot be denied, that a debtor may give a preference to a creditor or class of creditors. "A debtor has a right to prefer one creditor to another, and his private motives for giving the preference cannot affect the exercise of the right, if the preferred creditor has done nothing improper to procure it." 7 *Wheaton*, 556. "An insolvent debtor has a right to prefer one creditor to another, in payment, by an assignment made *bona fide*, and no subsequent attachment, or subsequently acquired lien, will avoid such assignment." 8 *Wheat.*, 268. "An assignment by a defendant, pending the plaintiff's suit, of all his effects for the benefit of his creditors, under which possession was immediately taken, is not fraudulent, although made to delay the plaintiff's execution, neither is it fraudulent to confess a judgment to one creditor, in order to defeat the pending execution of another creditor, for a debtor, as well as an executor, may give preference to a particular creditor." *2nd Starkie*, 622, 1*st Am. edit.* "As a debtor may prefer one creditor to another, so he may, on the eve of an execution by one creditor, assign his property to another, so as to satisfy the latter and leave the other unpaid." 5 *T. R.*, 235. "An assignment by a creditor of all his funds, for the use of such creditors as shall, within a prescribed period, execute a release of all their demands, is valid, if reasonable time is given to enable the creditors to have notice, and to decide whether they will accede to the terms." 4 *Wash. C. C. Reports*, 232.

If, in the books which have been cited, the law is correctly laid down, it would be difficult to maintain, that the deed under consideration is void. To be sure, in *England*, such a deed, if executed by a trader, would be considered fraudulent, and would be an act of bankruptcy. But this is not because, all debtors are under a real obligation to pay all creditors an equal proportion of their debts, but simply because it is in contravention to the policy of the bankrupt system. For the same

reason, if a debtor convey all his property to trustees, though for the benefit of all his creditors, it is an act of bankruptcy. There are some acts, remarks *Smith,* in his treatise on mercantile law, which, if done by *private persons,* are valid, but if done by a trader, are fraudulent. Here we have no bankrupt law, and all acts of this description, done by our citizens, are treated as the acts of "private persons," and are valid, if, when done in *England* by persons who are not traders, they would not be pronounced to be fraudulent and void, as against creditors.

The deed, it is true, must not be so framed as to keep the property in the power of the debtor. Such a case is to be found in 14 *Johnson,* 458. But in that case the deed was declared to be void, not because of the clause which required a release to be executed by the creditors, but by reason of a clause, that in case any of those creditors should refuse to give a discharge, then, "in further trust, after paying the debt due to the trustee, to pay such of the creditors of the assignors *as they,*" (the debtors,) "*should appoint.*" This clause, it was determined, kept the property in the hands of the debtors, and would enable them *to compel* the creditors to acquiesce in the terms offered to them. The deed was therefore declared to be void *in part;* and being void in part, the whole must be void. But with respect to the case before us, it may be said, in the words of *Jeremy, p.* 418, "the creditors are not under any obligation to accede to the terms proposed, and this court will not interfere to prevent any who have not accepted the same, from adopting measures to compel satisfaction of their demands, or to direct the execution of the purposes of the deed, where all of them have not concurred." In *Brashears vs. West and others,* 7 *Peters,* 614, *Chief Justice Marshall* said, "the preference given in this deed to favored creditors, though liable to abuse, and perhaps to serious objections, is the exercise of a power resulting from the ownership of property, which the law has not yet restrained."

Deeds of trust for the benefit of creditors may be fraudulent. They must not be executed *mala fide.* In 1*st Story's Equity,* 370, *&c.,* we are told what will render them void. But any

thing like an intent to defraud the plaintiff in this case, cannot be pretended. It can scarcely be said that such arrangements are necessarily void, while it is admitted, as in *Grogan vs. Cooke*, 2 *Ball and Beatty*, 230, that it is "neither illegal nor immoral" for the debtor to prefer one creditor to another. What then is the amount of the doctrine contended for on the part of the plaintiff? The deed which had been executed became void, because these plaintiffs, for whose benefit, among others, it had been executed, refused to accede to the terms of it. But the debtor may cancel that deed, and afterwards execute another, conveying the same property to those creditors, (naming them,) who have acceded to the terms, and this deed will place all his property out of the reach of the plaintiffs.

It must indeed be admitted, that in some of our sister States there seem to have been decisions that deeds, like the one before us, are void. These decisions, however, it is believed, have proceeded from a disposition in their courts, to make what has already been stated to be the policy of the bankrupt system, a part of the general law. Other courts, certainly entitled to as much respect here, have adjudged them to be valid. See *4th Washington C. C. R.*, 232. 4 *Mason*, 206. 2 *Binney*, 174. See also *2nd Story on Equity*, (the latest edition,) sec. 371. 4 *Dallas*, 224.

In *Maryland*, it is believed, there has been no decision by our highest judicial tribunals; but the general impression, it is thought, always has been, that a deed of this description, executed, *bona fide* by a debtor, for the benefit of such creditors as will release their claims, cannot be declared void at the instance of a creditor, who refused to sign such release; and that such deeds have not been condemned by that class of the community, who must be allowed to be the best judges upon the subject. In 4 *H. & J.*, 475, (*Pannel vs. McMechen,*) we have a deed, like this in its provisions, executed as long ago as in the year 1813, and to which every objection might have been urged, which has been urged to the deed under consideration. It is true, the point was not, and perhaps could not well be raised, in that case: but those who have a knowledge of those times, know, that there were creditors who would have

denied the validity of that deed, but for the, then, belief, that for any of the reasons now assigned, deeds of that description could not be assailed.

It is true it cannot be said, that in this State the question is *res adjudicata;* and of course it must be admitted, that the question, as yet, has not been finally and conclusively settled in this State. But is this a reason why these general, and long existing impressions of the law should not have great influence in the decision of the question? Our predecessors seem to have thought differently. In the case of the *State vs. Chase,* 6 *H. & J.,* 297, it was argued that the action could not be sustained, because, as it was supposed, the act of 1786, chap. 53, did not authorise a suit against the State, upon a claim of that description. The question had never before been made, and, of course, no decision in favor of the plaintiff could be cited. But the court said there was nothing in that objection : " The act of 1786, has so long and so often been practised upon," (some four or five suits grounded upon it had been brought,) " that it is not now thought to be *open to construction.*" In the case of *Kiersted and others, vs. the State,* the question arose, whether upon a bond given to the State by an insolvent, a suit could be brought for the use of creditors, there being " no authority so to take them." After stating, that upon enquiry the court had ascertained, that for more than twenty years they had been passed to the State, whether taken by the courts, the judges, or the commissioners of insolvent debtors, and remarking, that it is not easy to say what may have produced this unanimity, the learned judge proceeded : " Whatever may have led to the practice, its consistency fully establishes the cotemporaneous construction of the first act in this system of laws, and we think *it has too long obtained to be at this time shaken and disturbed.* See 1 *G. & J.,* 247. A reference might also be given to *Shafer vs. Stonebraker,* 4 *G. & J.,* 345. So in the case of *McKee vs. Delaney's lessee,* 5 *Cranch* 22, it was determined, that although the law of *Pennsylvania* required deeds to be acknowledged before *justices of the peace of the county where the lands lie;* and a practice which prevailed, of acknowledging them before a jus-

tice of the *Supreme Court*, was clearly, as the court supposed, unauthorised by the law, yet, as the impression and the usage in consequence of it had prevailed for many years, that usage, and not their interpretation of the words, was adopted by the court, as a correct construction of the act.   How far the judges of *England* will be governed by a prevalent usage, in commercial transactions, and others too, may be seen by a reference to "*Ram on Legal Judgments*," *p*. 67, &c.

These remarks have been made because of, and perhaps we can only find for them an excuse, in the strange and unhappy disposition which sometimes is met with, to quarrel with received opinions in regard to the law, and perhaps for no better reason, than that they have been for a long time the received opinion. It often happens that a question is not *res adjudicata*, because the community which is interested in it, had but one opinion about it, and yet, (such is the weakness of man, and how much to be deplored, if discovered in courts,) a belief is often entertained, that to question doctrines well known, though not *authoritatively* settled, denotes superior wisdom; and that the man who can imagine *that* to be law, which never was deemed to be so, must necessarily be wiser than all who lived before him.   Another evil of the day, (and it is an evil which it ought to be the business of courts to check, and correct, as far as it is possible,) is this, a jurist, or *qua* jurist, gets possession of a volume of the *Reports* of some other of the States, and there finds an express adjudication, expressly at war with the prevailing impressions in regard to the law of *Maryland*,—without reflecting, that although the law of another State be, as it there is adjudged to be, yet this is no proof that the law is so in *Maryland*,—he concludes, that the law as understood by those around him, cannot be our law, because the law is *adjudged* to be otherwise, elsewhere.   Now this is unquestionably to assume, that the law of this State is better understood every where out of *this State*, than by even the learned men of the State.   There are persons, moreover, in our community, who would be gainers by the discovery, if our own courts should chance to approve of the *exterritorial* decision, and without caring to enquire, how much of evil a decision

21     v. 4

contrary to the usage and custom among us, may produce, commence a litigation which is to decide a question, never before decided, because it never had been, and but for the decision in a different State, never would have been, questioned in *Maryland*. While it will not be maintained that the law, as understood by every body, ought not in any part of it, or under any circumstances, to be decided to be otherwise than it is so generally supposed to be, yet in a case of this description, I am prepared to say, that believing this deed to be valid, according to the consistent, and perhaps unvarying, impression among us, for very many years, it ought to remain unchanged: except, in the words of this court on a former occasion, "upon the most imperious and conclusive grounds." And I hesitate not to adopt unqualifiedly the reasoning of *Justice Story*, in deciding this question for *Massachusetts*, in the case, 4 *Mason* 206. I will add, that in deciding this question, of such importance to the commercial community, I am not disposed to undervalue the opinion of the eminent judge, who signed the exception before us, and this upon a question like the one under consideration.

In closing these remarks, which owe their existence to an equal division of the Court of Appeals, upon a question of importance to the business part of the community, I shall adopt, as more appropriate language in which to express my opinion, than any which I can command, the words of the distinguished judge in *Pearpoint and Lord vs. Graham, Wash. C. C. Rep.* 236 : " If," (said *Judge Washington,*) " the condition of executing releases is, *per se*, an evidence of fraud, then the deed was void as soon as it was made; and the subsequent acquiescence and compliance with the terms of the assignment by a part of the creditors, could not give it validity. \* \* \* \* Where a reasonable time is limited, within which the trust property is to vest in those for whom the beneficial interest is intended, or will be relieved from the operation of the assignment, I can perceive no reason for imputing fraud to such a transaction. It is true, that during that period the property is, or may be, protected from the claims of creditors : but it is so protected for the benefit of those very creditors, and consequently for an

honest purpose. It cannot, in short, be said to be made with intention to defraud, or to delay creditors, when its professed object is to put it in the power of creditors to accept or reject, the benefit intended them: and in the latter case, to leave the property subject to their rights, in like manner as it would have been, had the assignment not been made."

CHAMBERS, J., concurred with MAGRUDER, J.

JUDGMENT AFFIRMED.