JOHN KETTLEWELL *vs.* DAVID STEWART.—*December*, 1849.

In this case, the court, CHAMBERS, SPENCE, and MAGRUDER, J., against the opinion of MARTIN and FRICK, J., who dissented, and contrary to the decision in the case of *Albert and wife, vs. Winn and Ross, 7 Gill,* 446, sustained the validity of a deed conveying to a trustee all the grantor's property, in *trust,* to sell the same, and apply the proceeds, 1st. To the expenses of executing the trust and commissions to the trustee. 2nd. To the payment of a certain mortgage on the property. 3rd. To or towards the payment of the claims of all creditors who, within thirty days, should assent to the deed, and execute releases to the grantor of their claims. And 4th. To apply the balance, if any, to the payment of the claims of all other creditors than those therein provided for, rateably and proportionably.

Appeal from *Baltimore* county court.

This was an action of *trover*, brought by the appellee, on the 23rd March, 1846, against the appellant. The plaintiff recovered judgment in *Baltimore* county court. He claimed title under a deed executed to him on the 29th January, 1846, by *George Suter*, in consideration of $10, to various parcels of real, and articles of personal property. This deed was in trust, that *Stewart*—

1st. Would sell and dispose of the property conveyed to him.

2nd. To apply the proceeds to payment of all costs, &c., attending the execution of the trust, and five per cent. commissions to the trustee.

3rd. To the payment of a mortgage debt and interest, on a part of the real property conveyed.

4th. Towards the payment and satisfaction of the claims of all such of the creditors of the said *George Suter,* who may, within thirty days after the date of this deed, assent to the terms of this assignment, and execute a release to the said *Suter* from all liability on account of their respective claims against him, that is to say, rateably and proportionably, if the fund be insufficient to discharge the whole, or to the payment in full of said claims, if the same be sufficient for that purpose.

5th. If any balance or surplus should remain in the hands of the said trustee, to appropriate and apply the same to the payment, rateably and proportionally, of the claims of all the creditors of the said *George Suter,* other than those hereinbefore provided for.

6th. The trustee to be answerable only for wilful neglect or omission.

The defendant, *John Kettlewell,* was the sheriff of *Baltimore,* and had seized and sold the property declared for, under a writ of *fieri facias,* issued on the 27th May, 1846, by the *Bank of Westminster,* upon a judgment they had recovered against *George Suter,* on the 26th November, 1845.

The county court (PURVIANCE, A. J.,) was asked by the defendant to instruct the jury, that the deed under which *Stewart* claimed, was not a valid deed, to transfer to him the property mentioned in the declaration; and that he was not entitled to recover, which instruction was refused. The defendant appealed to this court.

The cause was argued before CHAMBERS, SPENCE, MAGRUDER, MARTIN, and FRICK, J.

NELSON, for the appellant, submitted the case on a brief printed statement, presenting as the only point involved, that the deed from *Suter* to the appellee, was void under the *Stat.* 13 *Eliz., ch.* 5, because of the preference it affected to give to the creditors of the grantor, who would consent to release him over all other creditors who would not assent to such terms. He referred to the case of *Albert and wife, vs. Winn and*

*Ross*, since reported in *7 Gill*, 446, as conclusive of this question.

McMahon, for the appellee, denied that the fate of this appeal necessarily depended on the solution of the question submitted by the counsel for the appellant. There were other points on which the appellee might rely for an affirmance of the judgment of the court below; which points the learned counsel briefly explained. But he was prepared to discuss the general question involving the validity of the deed as a conditional performance. If the question was not settled by the decision in *Albert vs. Winn*, referred to by the other side, he would ask permission to express his views on the subject.

After a brief consultation on the bench, the presiding judge said, that the general question was interesting and important, involving the validity of many transactions, and bringing into question, perhaps, many titles. Under all circumstances, the court thought the decision in the case referred to, ought not to be treated as conclusive against the validity of conditional preferences. The court would, therefore, receive written arguments of counsel on the general question, in the hope that, with the aid of further discussion, the court might be able to pronounce a judgment which might serve as a guide in all future cases. In consequence of this intimation, the following argument was submitted by

McMahon and Alexander, for the appellee:

We shall assume, for the purpose of this argument, that the debtor, in making the assignment, had no purpose of actual fraud in contemplation; and that the deed contained no provision calculated, by its tendency, to hinder or delay the application of the debtor's estate to the payment of his debts. The question, then, will be, whether fraud, which is to avoid the deed, is to be inferred as a conclusion of law, from the clause which requires the creditor, who would avail himself of the preference, in consideration thereof, to release his claim to the debtor?

Now we may assume it as settled in *Maryland*, that a debtor, in failing circumstances, may prefer one or more of his creditors, at his pleasure. *State of Maryland vs. Bank of Maryland*, 6 *G. & J.*, 205. And the preference may be given by a deed assigning all the debtor's estate, in trust, to provide for payment, in the first place, of the preferred creditors; and in the next place, of all other creditors. The effect of such assignment, is to delay and hinder creditors, by defeating the lien of judgments subsequently recovered, and disappointing executions subsequently issued. But, in view of the object of the assignment, and of the remedy which equity supplies for administering the trust, such transfer of jurisdiction is held not to be fraudulent. In *Pickstock vs. Lister*, 3 *M. & S.*, 371, (which is referred to by this court in terms of approval,) the assignment was supported at law, although it was for the purpose avowed, of disappointing a particular creditor, who was about to issue his execution. See, also, *Riches vs. Evans*, 9 *Car. & P.*, 640, to the same point. We may safely conclude, therefore, that a deed whereby one or more creditors are preferred absolutely and unconditionally to others, is not to be avoided as fraudulent at common law, or under the *Stat*. 13 *Eliz.*, *ch.* 5.

The question, then, must be, may a debtor, in circumstances which authorise him to make an absolute preference, annex conditions to be performed or assented to by the creditors intended to be preferred? We submit, that if the debtor had previously hypothecated parcels of his effects to particular creditors, he might, in a deed assigning all his property for the equal benefit of all his creditors, provide, that the creditors who were already secured, in part or in the whole, should come in only on condition that the effects hypothecated to them should be abandoned, for the benefit of the general fund. Or he might provide, that the creditor, surrendering his particular security, or waiving his remedy against parties standing in the relation of surety to the debtor, should, in consideration of such surrender or waiver, be preferred over all others. If these positions be conceded, it will result, that a preference is not necessarily

fraudulent, because it is conditional in its form. And the objection resolves itself into an objection against the specific condition requiring a release from the creditor to be preferred as a consideration for the preference.

But we have already stated, that the right of the debtor to create preferences amongst his creditors, is uncontrollable. No court will inquire into the motive for the preference. He may prefer one in gratitude for past kindnesses, another in expectation of future assistance; and a third in fulfilment of a previous agreement, that the creditor shall accept the preference in full satisfaction of his claim. But, if he is at liberty to treat with one, and another, and every of his creditors in succession, for a relinquishment of his or their claims against him, and if an assignment made in execution of such agreement, is good against his unpreferred creditors, why may he not, in the absence of a preliminary agreement, assign to any one of his creditors, on condition expressed, that such creditor shall release the debtor from the obligation of his contract? And why may he not annex to his assignment the further condition, that another creditor, on executing a similar release, shall share in the preference? It is understood, indeed, that no objection is made to the power of the debtor to prefer one or more of his creditors, by name, on any terms which he or they may see fit to accept. The objection is to his right to prefer creditors indefinite in number, and distinguished only by their acceptance of prescribed conditions.

Now we ask for the legal evidence upon which the distinction supposed is to be rested. The burden of the argument is upon those who affirm its existence, and their arguments must be consistent with the right of the debtor to prefer absolutely—to annex other conditions to his preference—to require a release as the consideration for a preference to one or more creditors by name. But we shall not rest our case on the absence of argument on the other side. Nor shall we consume time in the effort to show that the distinction is unsubstantial and may be resolved into a matter of form. But, addressing ourselves at once to the usual case of a deed to trustees, preferring all cre-

ditors who shall release their claims, we shall endeavor to show that, upon legal principles, such deed, if obnoxious to no other objection, ought to be sustained.

The direct argument in favor of this proposition, may be compressed within a very narrow compass. The deed annexing conditions to the preference intended, will be good as against those creditors who accept its terms. As between them and the debtor, it rests on a legal and valuable consideration; and by their giving the releases required of them, the preference, so far as they are concerned, becomes absolute. Can the unpreferred creditors justly object, that the debtor has thought fit to annex a condition to a preference in favor of another, which preference might have been given in absolute terms? Is he, by reason of the condition, placed in a worse condition than he would have occupied if the preference had been originally absolute? It is easy to show that the condition is, on the contrary, for his advantage. It is made uncertain, whether the preference will be accepted on the terms proposed; he has an opportunity, by accepting the condition, of placing himself on an equality with the most favored creditor; and, in any event, a compliance on the part of the creditors accepting the preference with the condition of release, by reducing the extent of the debtor's liabilities, increases his prospective ability to pay his remaining debts. *Chief Justice Gibson*, in *Thomas vs. Jenks*, 5 *Rawle*, 225, rightly affirms, that the arbitrary control over the order of payment of his debts, which is allowed the debtor by the common law, and is not restrained by the *Stat.* 13 *Eliz.*, and which suffers him to postpone any creditor to the rest, "makes participation of the fund, before those he may choose to prefer are served, not so much a matter of right as of favor. To let a creditor in among the first, therefore, though on condition that he release the unpaid residue of his debt, may be to him a favor, instead of a wrong, which may consequently be extended to him on terms, or not at all. Having an unquestionable power of preference, of which he is the absolute master, it follows that he may set his price on it, provided it is

not a reservation of part of the effects for himself, or any thing that would carry his power beyond mere preference."

But the argument in favor of the debtor's right to stipulate for releases from the creditors to be preferred, receives additional strength from the views expressed by his honor, *Judge Chambers*, in delivering the opinion of this court, in the case of *Somerville vs. Brown*, 5 *Gill*, 422: " Our whole system regulating the relation of debtor and creditor, is designed to subject every dollar's worth of property, real, personal and mixed, to the just claims of a creditor, and to exempt the honest debtor, who does surrender all such property, from the grasp of a relentless creditor, who might desire to imprison his person, or weigh down his future energies by the impending burthen of his debts." The debtor must surrender up all his property; he must reserve no beneficial interest therein for himself; he must embarrass its surrender with no unusual provisions, to delay or hinder its speedy application in payment of his debts. The creditor has a right *to every dollar's worth* of the property which the debtor is then possessed of. But the law denies his right to incarcerate the person of his debtor, or to *weigh down his energies* by seizing on all his future earnings. Such is the policy of our law, and a policy less humane could not be tolerated by a system of jurisprudence, which boasts that its ethics are derived from a religion that inculcates the duty of forbearance in the exercise of our rights, by reminding us continually of our need of forbearance at the hands of a common Superior.

To deny the right of the debtor who surrenders up his all to a discharge from the obligation of his contracts, is, therefore, to contravene the policy of our laws. It is to attribute to the creditor rights, and to suppose that he is bound to no correlative duties. Hence it is, that the effort made by the honest debtor to protect his person from confinement, and to place himself in condition to resume his business, is denounced as an attempt to coerce the creditor. But when we enquire, what is the object of the coercion which is so much reprobated? the reply must be, to oblige the creditor, otherwise relentless, to extend to his unfortunate debtor that indulgence for which, in the impressive

Kellewell *vs.* Stewart.—1849.

language of *Chief Justice Marshall*, in 1 *Peters*, 615, "humanity and policy plead so strongly, that in every commercial country known to us, (but our own,) the principle is established by law." And when it is asked, by what process is that coercion sought to be effected? the answer is, by the exercise of that power of preference which, in mercy to the unfortunate debtor, the common law refused to control.

Thus we perceive, that the debtor, in exacting a release from his creditor as the condition for the surrender of his property, exercises his unquestionable right to prefer, in advancement of the policy, which the law, from motives of humanity, has established. Adopting, again, the language of *Chief Justice Marshall*, "this certainly furnishes a very imposing argument against its being deemed fraudulent." Nor is the coercion which is exercised over the creditor, through the instrumentality of a deed executed, comparable in intensity and injustice, with that coercion which a debtor familiarly exercises in chaffering with his creditors for a composition, holding his property all the while as a lure to the more facile, and as a weapon of threatening against those who would, otherwise, be less manageable. Deeds of composition are universally supported; and agreements for a composition have been enforced in equity, and recognized at law. But it would be very difficult to sustain those adjudications upon the hypothesis, that a debtor, in creating a preference, may not stipulate for an advantage to himself. Every deed and agreement for composition, contemplates advantage or benefit to the debtor.

We are unable to find any case, at all venerable for antiquity, in which such limitation on the right of the debtor to prefer, is maintained; and if such limitation exists, it must be acknowledged that it is one of modern origin. Far be it from us, to question the duty of the debtor to fulfil his contract to the extent of his ability. We affirm, simply, that the obligation which he contracts with his creditor, does not supersede the duty which he owes, perchance, to a family dependent on him for subsistence, and to society. And the moral, social and commercial ameliorations which *England* has experienced,

under the beneficent influence of her bankrupt system, would serve to convince us, if otherwise incredulous, that sound policy and sound morals are not inconsistent with the denial, to the creditor, of the privilege of treating misfortune in trade as a crime, which is to be expiated only by perpetual imprisonment.

Assuming, then, the soundness of the policy which assures to the debtor, upon surrender of his whole estate, an immunity from imprisonment, and the enjoyment of his future earnings, our sole enquiry should be, whether there is any mode of affording to him that remedy less exceptionable than the exercise of his power of preference? That evils may result from its exercise, is admitted. The same may be predicated of every power. It is sufficient praise of any principle, that, on the balance of good and evil flowing from its practical application, the good predominates. The arbitrary exercise of the admitted right of absolute preference, is frequently the cause of rank injustice. But the power of preference exists. When it is shown, therefore, that evil consequences flow from the toleration of those conditional preferences, the argument, to be rendered effective, must further prove that those evils are greater than the evils which were designed to be remedied; or, that some other remedy exists, which may effect equal benefits with consequences less injurious.

Does any other remedy exist? It is said that the insolvent laws afford sufficient protection to the debtor, and that the allowance of conditional preferences enables the debtor, in the administration of his estate, to substitute his own will for the more equal, summary and effectual rule of distribution, which is provided by the law, and to avoid that searching scrutiny into his affairs, and the causes of his inability, which are indispensable to guard against a fraudulent debtor.

This objection to such deeds, it will be seen, necessarily concedes, that the debtor, dedicating all the property he then has to the payment of his debts, and annexing only the condition, that such total surrender shall release him for the future, by proposing such a condition, exacts nothing that is wrong or fraudulent on his part; but, on the contrary, only proposes

what the insolvent laws, themselves, accomplish more effectu-
ally and justly for all parties. The purposes and policy of our
insolvent system are too obvious to require comment. Their
manifest aim and end is, the release of the person and future
earnings of the debtor; not only from a feeling of humanity to
the debtor, but also upon principles of public policy, founded
on the interest which society has in promoting the happiness
and stimulating the industry of all its members. And if the
benign purposes of this system were, in fact, accomplished by
its practical operation, there would be some force in this objec-
tion; although, even then, it would, as it seems to us, be diffi-
cult to maintain, that the debtor, seeking the same ends by the
condition he proposed, was guilty of a fraud. It so happens,
however, that our insolvent system, in consequence of the
limited authority of the State government, is incompetent to
accomplish the leading purposes which it had in view, " the
equal distribution of all the property of the debtor amongst all
the creditors, and the discharge of the debtor from *all* his debts."
It cannot be doubted that these were the designs, and were ex-
pected to be the results of this system when it was first estab-
lished. But so soon as it was decided that, under the provi-
sions of the constitution of the *United States*, the insolvent
laws of the State could have no operation upon the *foreign*
creditor, these designs were, in a great measure, subverted, and
it has become, by its practical operation, a system which prefers
the foreign at the expense of the domestic creditor, and, at the
same time, leaves the debtor entirely at the mercy of the foreign,
whilst it discharges him from the domestic creditor. And
thus, whilst it substantially gives the foreign creditor a prefer-
ence as to the property the debtor then has, and still leaves the
person of the debtor, and all his future property, exposed to the
prosecution of such creditor, it at the same time, whilst it post-
pones the domestic creditor, wholly discharges his debt. So
that the very creditor, from whom alone any consideration in
the eye of this system proceeds, the creditor from whom the
debtor is discharged, is the creditor postponed, and oftentimes
wholly excluded from all participation in the debtor's effects.

A mere reference to the decision of this court, in the case of *Larrabee vs. Talbot,* will illustrate these results. The debtor, no matter what his condition of insolvency, may prefer the foreign creditor, or distribute all his property by such preferences, and the system cannot reach them, or affect his right to a discharge from his domestic debts. And, as the insolvent laws of the State are incompetent to release from the foreign claimant, and the preference of such claimant is not illegal and improper, their result, instead of equal distribution, is only to tempt the debtor to the preference of the foreign claim. Again, it is settled, that no transfer of the debtor's property, by operation of the insolvent laws, consequent upon the debtor's application for the benefit of them, can affect the foreign creditor's right to pursue that property even into the hands of the trustee appointed under his application. And hence the insolvent laws, even after the application of the debtor, and the appointment of his trustee, are incompetent to put the foreign creditor to his election, whether he will come in and partake equally of the property, on condition of the discharge of the debtor, or keep out and retain his rights and remedies unaffected by the application.

In view of these, the actual results of the system, we are, then, certainly justified in saying, that whilst our laws, by the adoption of this system, acknowledge and establish the policy and justice of the proposition, "that the debtor, surrendering all he has, should be released," they utterly fail in their operation as to their two great objects, "equal distribution of all, and discharge in consideration of it." And we might add, that so far as the *home* creditor is concerned, and, perhaps, the *debtor* too, it were better that the system, as tending to defeat its own purposes, were abolished, if some mode of accomplishing these objections cannot be constitutionally introduced as a part of the system. Certain it is, as it seems to us, that it affords no such relief to either party, debtor or creditor, as it contemplated, and no such substitute for the debtor's power of making terms with his creditors, as ought to disarm him of his common law power of preference, when exerted for no other purpose than that of

future release, in consideration of the surrender of all the property he has any title to, or can convey. And it is only by the instrumentality of such deeds as the present, that the policy embalmed in our insolvent system, can be carried out, and by the aid of an acknowledged common law right, which conflicts with no provision of the constitution of the *United States*, and which, whilst it leaves every creditor free to elect or reject at his pleasure, ensures to the creditor all the debtor has, and equality in participation of it, on no harder terms than those of future release. Nothing that the insolvent laws can do, can force the foreign creditor either to discharge, or come in and take his equal dividend. But, by these deeds, the option is presented to him, of placing himself on the same platform with the home creditor, or, if he declines this equality, of retaining all his rights and remedies, for the future, unimpaired. And, upon principles of justice, his exclusion, if he seeks more than equality, can hardly be condemned as *fraudulent*, whilst, at the same time, the prospect of present exclusion tends to promote the other great object of the law, in the release of the debtor from pecuniary thraldom. And, as to the domestic creditors, it is manifest that the effect of such conditional deeds is highly advantageous, by promoting and securing an equal and, therefore, equitable distribution amongst all, and giving them some consideration for discharge, where, otherwise, they are, by law, subject to the discharge, and may, at the same time, be excluded from any share of the present property of the debtor, for the benefit of other creditors, who, whilst they are preferred as to the present possessions of the debtor, retain their rights unimpaired for the future, so far as their claims are undischarged by the property the debtor then has.

This objection, as we have already remarked, concedes, that so far as the object of these deeds is, to obtain the release of the person and future earnings of the debtor upon a fair surrender of all the property he has, it is, in the eye of our law, a proper object, but that it is one, for the attainment of which it is not necessary to sustain such deeds, because it is one which is more happily and more justly arrived at, by leaving the debt-

or's effects to administration in insolvency.   This capacity of our insolvent laws to bring about the same results, if admitted, would not, as has already been said, demonstrate that there would be any fraud on the part of the debtor, in attempting to arrive at the same results by his own voluntary act or deed. It can never be a fraud upon the law to carry out purposes, which the law itself not only recognises as proper, but which it also makes the basis of its own action, whenever it assumes the administration of the insolvent's effects, and, therefore, if it were even admitted that under the stern principles of the common law, as it existed before the introduction of bankrupt or insolvent systems, there might be some objection to the debtor's requiring a discharge on such terms, it ceases the instant the law itself is so modified as to make a concession of the same terms of discharge a just ingredient in the obligations of contracts.   At the common law, when unmodified by bankrupt or insolvent systems, the person and property of the debtor were forever exposed to the prosecution of the creditor, and nothing but the grave could shut him out from the pursuit of the person.   Yet, even under that, as will be seen by the convincing decisions of the *English* courts, hereafter referred to, the law, from principles of humanity, tolerated the debtor in making his discharge a condition of his conveyance.   But when the law itself adopts the right of discharge as a rule for its own government, in its control over the relation of debtor and creditor, all pretence of fraud upon the law must cease, and the debtor asking such discharge, instead of exercising a right connived at or barely tolerated, is now acting under and in obedience to the policy of the law.   It is the peculiar excellence of the common law, that it consists of a system of principles, which contract or expand, to meet the changes in the condition or institutions of society, and which are susceptible of ready adaptation to its ever varying exigencies.   As is justly remarked by *Lord Mansfield*, (1 *Durnf. and East.*, 8:) "As the times alter, new customs and new manners arise, these occasion exceptions, and justice and convenience require different applications of those exceptions within the principle of the

general rule." And again he says, *(3 Douglas*, 373:) "As the usages of society alter, the law must adapt itself to the various situations of mankind." And it cannot therefore be doubted, that where the law, as modified by bankrupt or insolvent systems, has declared the debtor's right to a discharge upon a fair surrender of his property, the debtor, in the eye of the law, commits no fraud in exacting such a discharge in his voluntary conveyance of all: and when, as we have already shown, the insolvent system, from causes beyond its control and beside its intent, fails to accomplish that which it aimed at, it is still more manifest that the debtor, seeking by his voluntary deed to arrive at the same results, and, in a great measure, accomplishing by it what the law utterly fails in, instead of committing a fraud, is rather to be regarded and favored as ministering to the purposes of the law.

But it is further objected, that in cases of discharge under the insolvent law, the creditor is entitled to the right of recourse to the debtor's future acquisitions, by gift, devise, descent, or in a course of distribution, which right is lost or surrendered by releases exacted under such deeds as the present. So far as such deeds aim at the release of the *debtor's person and future earnings*, this objection concedes that there is no fraud, and as we have already remarked, such a release is in accordance with the settled policy of the law in this State, and may rightfully be demanded upon the terms of a total surrender of his property. And then it comes round to the question, "is the exaction of the release fraudulent under the *statute of Elizabeth* or at common law, because, by the surrender of the debt, the creditor loses the power of proceeding in future, not against the property which the debtor then has, or can they convey (for that is conveyed,) but against property, which, by possibility, the debtor may thereafter acquire by the bounty of others or the bounty of the law, and to which, at that period, he has not a shadow of title?" Of such interests it is to be observed, that they are what the law terms "naked possibilities," and are not recognised by the common law as interests at all, so as to be assignable in any mode, or as incapacitating

the party as a witness because of interest.    They are, in other
words, mere expectancies, or hopes of gift or succession, which
in the eye of the common law, constitute no present or vested
title, right or interest whatever, which the debtor could convey.
Nor are they interests, which the deed in the present case ope-
rates upon *by way of conveyance,* and it would seem to us to
be almost a solecism in term, to say that a deed is to be held
fraudulent and void, as *a fraudulent conveyance* of property at
the common law, only because the release of the debt may
prevent a possible recourse to an expectancy which the com-
mon law considers at the time of making the deed, as no right,
title or interest whatever, and which the deed itself cannot con-
vey, and does not profess to convey.

On this subject, we beg leave to refer to the language of
the court, in 5 *Rawle,* 226, where that eminent judge, *Chief
Justice Gibson,* whilst holding that the debtor, if he exacts a
release, must convey all his property, remarks: "But why, it
may be demanded, shall not the debtor be suffered to stipulate
for a part of the property, as well as for the exemption of his
person and future acquirements?    The answer is, that the
statute, by which alone any stipulated exemption is prohibited,
*looks but to property which may be the subject of present
assignment.*    It protects the creditor's recourse to the property
conveyed, by avoiding all conveyances that would delay, hin-
der and defraud him of it, without, however, *protecting* his
recourse to anything else, because the assignment cannot oper-
ate on anything else."    The point of these remarks is obvious;
the *statute of Elizabeth,* (which is but in affirmance of the
common law,) had reference to conveyances and assignments
creating a delay and hindrance by passing such interests as
were *then assignable,* and were in fact assigned by the deed
objected to, and not to mere possibilities or expectancies, such
as a possible donee, heir, devisee or legatee, might thereafter
acquire by gift, devise, descent, or in a course of distribution.
The statute has reference to *conveyances* made to hinder and
delay creditors in the collection of their debts, and *to such in-
terests as a conveyance may pass,* and not to mere expectan-

cies, which are not the subject of assignment. The *convey-ance objected to in this case, does not and cannot be pretended to pass any such expectancies*, and, therefore, does not, as a mere conveyance, put them out of the reach of the creditor. Their future exemption, if they fall in, only results from the creditor's agreeing to release his debt, and the mere incidental result of it in working a surrender of *a possible recourse at some future day to a possibility*, could hardly be regarded as a fraud within the contemplation of this statute. The fact that the insolvent laws may save these expectancies for creditors, does not prove that the required surrender of them by the surrender of the debt, is therefore a fraud under the *statute of Elizabeth*. The single question is, "does the common law or the *statute of Elizabeth* hold a conveyance fraudulent and void, which in fact conveys and dedicates to the use of the creditors, all the property to or in which the debtor has then any right, title or interest, or which he can convey, in consideration of a release, merely because that release might surrender a possible recourse to a mere expectancy, which, at the period of the release, is not a right, title or interest known to the law?" And we submit, that such a possible result does not constitute a fraud under either.

And we may here add with reference to the *practical* value of this objection to such releases, that in fact it seldom, if ever, surrenders anything; for so long as it is shown that such gifts, devises, &c., if made, will fall within the grasp of the creditor, this very knowledge prevents the making of them, and they are made to others of his family, or so covered as to elude observation. The surrender, in effect, at the time when it is made, takes nothing from the grasp of the creditor which belongs to the debtor, or will probably ever belong to him whilst he remains such a debtor.

Having thus explained the grounds on which we presume to think that a debtor, upon principle, may, in a conveyance of all his property, prefer such of his creditors as will release him from payment of their debts, we proceed next to show that such assignments are equally sustainable by authority. In the pro-

gress of our researches in *English* books, we have discovered no case in which the validity of such conditional preferences has been doubted by the court, and only one in which they have been questioned in argument. Compositions between the debtor and his creditors, are of very frequent occurrence, and they rest on the acknowledged right of the debtor in surrendering up his property, to stipulate for advantages to himself. The numerous cases in which compositions have been enforced, constitute a part of that "uniform current of *English* decisions" which the present chief justice of the Supreme Court relies on as sustaining the validity of those conditional preferences.

There are, also, cases in which the validity of the preferences is affirmed. The *King*, in aid of *Braddock vs. Watson*, 3 *Price*, 6, is a case of this description. This has been characterised as a *bald case*. But the report leaves no difficulty in ascertaining the material facts which were presented, the questions which were discussed, or the grounds of the decision. The defendant's plea, which was admitted by the demurrer, states that the assignment was of all the debtor's estate, in trust, for the benefit of all his creditors, but contained a proviso, that in consideration of said assignment, the creditors should take the same, and the moneys to arise therefrom, "in full satisfaction and discharge of their several and respective debts then due and owing to them, and release the said debts then due and owing to them, and release the said debtor therefrom." It was, no doubt, the original design, that all the creditors should concur in this deed. But it is expressly stated, that several creditors, including *Braddock*, had refused to execute it. The plea averred, that the debts due to the assignees and other creditors, who had executed the deed, exceeded, in amount, the value of the property assigned. And the defence rests on this ground.

The counsel for the plaintiff insisted, that the "assignment was fraudulent under the *Stat.* 13 *Eliz.*, as against *Braddock*, and might, therefore, be avoided by him." This was the more strongly pressed "from the fact of there being inserted in the assignment a condition to be imposed on all who should entitle

themselves to benefit under it, by signing it, that they should release the debtor from the rest of their demands, in consideration of such dividend as they should receive." The court declared: "There is certainly no fraud in this case, affecting the assignment which has been made for the equal benefit of all creditors, *Braddock* as well as the rest." This is a very "common arrangement, which it would be very injurious to disturb." And *Richards*, *Baron*, after explaining the case of *Pickstock vs. Lyster*, 3 *M. & S.*, 371, added: "Such a deed certainly ought not to be avoidable by any particular creditor not attempted to be excluded from the benefit of it; *and no such attempt has been made in the present instance.*" The tender of a preference, on condition that the creditor will release, is not an attempt to exclude him from the benefit of the assignment. Here, then, we have a case in which the facts, as pleaded, present the very issue. The question raised on the validity of those conditional preferences, is earnestly discussed, and it is directly met and decided. But the court did more than decide the question. It is declared, that the deed in this form "is a very common arrangement." And the counsel, himself, argues chiefly from the special circumstances, as if conscious that the general question had been settled by the common consent of the profession against him. Amongst other arguments urged, it was insisted, that the condition operated "to compel the creditor to accede to a composition which the bankrupt laws could not force him to submit to. A creditor may object to sign a bankrupt's certificate, whereby he keeps his future effects liable." This argument failed of effect, and would be wholly misplaced in *Maryland*, where the discharge is a full protection to all future acquisitions.

The question was again presented in the case of *Owen vs. Body*, 5 *Ad. & Ellis*, 28, (*31 Eng. C. L.*, 254,) and the manner in which the question is discussed and determined, confirms us in the inferences which we have deduced from the preceding case of the *King vs. Watson*, that the common opinion at *Westminster* is fixed in favor of the validity of those conditional preferences. The assignment was made by an inn-keeper, of

all his effects, including his interest in the house, for the equal
benefit of all his creditors who would execute the deed, and
"accept and take the dividend or dividends, to arise and be pro-
duced out of and from the said goods, and chattels, and effects,
in full satisfaction of his debt." The deed likewise authorized
the trustees so long as they should think it desirable and ad-
vantageous to do so, to "continue and carry on the business"
of the grantor in the deed for the benefit of the creditors. The
deed was executed by the trustees and two other creditors, but
not by the defendants, who were also creditors. The trustees
entered into possession, and continued the business through the
agency of the grantor. The defendants recovered judgments
against the grantor, and laid their executions on the goods. On
their part it was insisted, that the deed was not valid as against
the creditors who had not executed it, "being only a transfer
of it to the intent that the parties executing it, might carry on
the business of partners;" and in the argument in reply, their
counsel insisted, that it was not "a *bona fide* assignment within
the authority of *Pickstock vs. Lyster*, because the goods were
not conveyed for the direct object of their being converted into
money, and applied in satisfaction of the debts, *but to be traded
with*." It was "an assignment on speculation." "In the
case of a regular assignment, the creditor coming in, entitles
himself to a dividend, and runs no risk. But here, such a
creditor would be a partner with the trustees, taking the profits
of the hotel, liable for the debts incurred in carrying it on, and,
perhaps, even subject to the bankrupt laws." *Lord Denman,*
after the argument, stated that the question discussed was very
doubtful, and the court would take time to consider it. At a
subsequent day, he delivered the opinion of the court, which
was adverse to the validity of the assignment. "The deed
imposed such terms as might have constituted a partnership
among the persons executing it; and *those* were terms to which
the creditors were not bound to submit." It is hardly possible
that the counsel and the court could have overlooked the fact,
that the assignment preferred creditors who should execute re-
leases to the debtor. The only inference which occurs to us,

is, that the conditional preference, *per se,* would have been deemed lawful.

In *Tatlock vs. Smith,* 6 *Bing.,* 339, *(*19 *Eng. C. L.,* 94,*)* an agreement had been entered into between the debtor and his creditors for a composition. A deed was prepared and presented to the debtor; but he refused to execute it, objecting to the sufficiency of the release therein. The plaintiffs, being creditors, thereupon commenced this action against their debtor, insisting that the failure of the debtor to execute the deed, avoided the agreement. The court held, that the deed tendered was not in proper form, and the defendant's objection was, therefore reasonable; that, in any event, the action was premature, as the defendant could not be put in default until the deed had been executed by all the creditors, and, in this form, tendered to him for execution; and (which is the material point,) that the agreement, having been in part performed by the debtor, was binding on all his creditors who had entered into the agreement. Upon this case, we would respectfully remark, that if the conveyance of the debtor's estate in trust for creditors who assent to certain terms prescribed by him, would be fraudulent and void, as against the policy of the *Stat.* 13 *Eliz., ch.* 5, or at common law; an agreement for a composition on such terms, so long as it remains executory, ought not to be respected or enforced, even as against the creditor who had, under the influence of undue coercion, assented thereto. The principle undoubtedly is, that an agreement is not to be executed which, when executed, will be set aside as fraudulent against other persons. Nor is there any equity in favor of the debtor arising out of the fact, that he has surrendered a part of his effects in part performance of such agreement. We infer, from the court's opinion, that the object contemplated by the agreement, does not contravene the policy of the law; on the contrary, that the debtor may legally exert the influence which his control over his property secures to him, in order to coerce his creditors into reasonable terms of composition.

Without troubling the court with references to other cases in which the judgment of the court necessarily assumed the va-

lidity of those conditional preferences, we may content ourselves with the broad assertion, that "there is no case to be found in the *English* books in which a contrary opinion has been expressed by the court, or (if we except the case of the *King vs. Watson*, already alluded to,) even by counsel in argument."

Admitting, then, that the more recent *American* cases are in a state of distressing conflict with each other, we will proceed to show that, in the language of the present chief justice of the Supreme Court, in *White vs. Winn and Ross*, "The weight of judicial authority, in this country, is in favor of the right of the debtor, (in the absence of any bankrupt or insolvent law,) by a conveyance, devoting his entire estate to the payment of his debts, to prefer creditors who will consent to release him from these claims, to other creditors who will not accept such terms."

"Such are the conclusions of the late *Chancellor Kent* and *Justice Story*, whose concurrent opinions on those subjects (and may we not add, on all legal subjects?) deserve the highest considerations."

In 2 *Story Eq.*, sec. 1039, it is stated, as a general conclusion from the cases, that priorities and preferences, by debtors, in favor of particular creditors, "are not deemed fraudulent or inequitable; and even a stipulation on the part of the debtor, in such an assignment, that the creditors taking under it shall release and discharge him from all their future claims beyond the property assigned, will, it seems, be valid and binding on such creditors."

The learned author sustains his text by referring, amongst others, to the case of *Hasley vs. Whitney*, 4 *Mason*, 207, decided by him early in his judicial career. The influence of this case, as authority, is supposed to be lessened by the admission of the judge, in page 230, "that if the question were entirely new, and many estates had not passed upon the faith of such assignments, the strong inclination of my (his) mind would be against the validity of them." It seems to have been overlooked, that, in the same paragraph, he declares, "that the weight of authority is in favor of the stipulation," and that he

yielded to that authority "*without reluctance.*" As *res nova*, the inclination of his mind would have been in one direction. In fulfilment of one of the first duties of the judge, he was obliged to expound and apply the law which he found already established. With *Lord Alvanley*, he considered that whatever the private opinions of the judge may be, it is safer to conform to the established decisions." And in the language of *Lord Hardwicke*, that "to gratify private opinion, established opinions are not to be receded from." He thought it was wiser "to adhere to prior determinations, although we cannot always understand the reasons on which they are grounded," and could not, in the pursuit of a refined equity, disturb the many titles which had been acquired upon the faith of an established rule.

But, again, it is to be remarked, that in *Halsey vs. Whitney*, the deed did not merely prefer one class of creditors to another. The recusant creditors were entirely excluded for the benefit of the debtor himself. The entire argument of the learned judge is addressed against *such* assignments. We shall quote a single sentence which follows his review of the *New York* cases: "Tried by this principle, the stipulation in the present case would make the assignment utterly void; for the surplus, after payment of the assenting creditors, is to go to the debtor." We agree that the principle of "such assignments" is very questionable. They transcend the limits within which the right of preference is to be confined. They would reserve a part of his effects to the debtor himself, and would carry his power beyond mere preference.

In the course of his remarks, the learned judge assumed that the question had been settled in *Massachusetts*. The correctness of his deductions has been doubted; but we are inclined to believe that he is sustained in his view by the cases of *Andrews vs. Ludlow*, 5 *Pick.*, 28, and *Nostrand vs. Atwood*, 19 *Pick.*, 281.

In 2 *Kent's Com.*, 536, the chancellor affirms, that "the weight of general authority, both *English* and *American*, is, that an assignment by a debtor of all his property, for the pay-

ment of his debts, and, at the same time, giving preferences and requiring an absolute release from each creditor who accedes, is not *per se* fraudulent and void. The circumstances of the debtor assigning over to the trustees all his property, without any reservation to himself, and giving the surplus, if any, to those creditors, if any, who do not come in and agree to release, on taking their preferred share, is deemed to disarm the transaction of all illegality and unfairness."

The decisions in *New York*, anterior to the case of *Grover vs. Wakeman*, 11 *Wend.*, 187, are in conformity with the foregoing doctrines. For those cases in which the assignment was avoided, "did not turn upon the naked point of a release, but upon that as incorporated into a peculiar trust." 4 *Mason*, 230. As in *Riggs vs. Murray*, 2 *Johns. C. C.*, 565, where, amongst other exceptionable clauses, there was a power of revocation reserved to the grantors. In *Seaving vs. Brinkerhoff*, 5 *Johns. C. C.*, 329, the conveyance was of a part only of the grantor's property. In *Hyslop vs. Clark*, 14 *Johns.*, 458, on the refusal of any one creditor, the trust was avoided, and the grantors were authorised to declare new trusts. And in *Austin vs. Bell*, 20 *Johns.*, 442, the dividends attributed to the creditors who would not release, were to be paid over to the grantor. It must be admitted, that the case of *Grover vs. Wakeman*, more recently adjudged, establishes a very different rule in *New York*. That case has been truly characterised as "the most stern decision that exists either in *England* or in this country," and stands in most striking contrast with the decision by the same court of errors, in *Murray vs. Riggs*, 15 *Johns.*, 571, where the assignment was adjudged to be valid, although it in the first place reserved to the use of the grantors, until one year after they should be discharged by law from their debts, $2,000 a year; gave preferences, empowered the trustees to settle with the creditors on certain terms, and provided that the creditors who did not subscribe to the conditions within one year, or should knowingly embarrass the object of the trust, should be excluded. Such vacillation detracts from the authority of any judicial tribunal, and would lead us

to anticipate within the next cycle another modification of the doctrine. For the present, the law in *New York*, would appear to be firmly settled against the validity of conditional · assignments. But it is to be recollected, that the policy of her laws, regulating the relation of debtor and creditor, is very different from that which prevails in this State; and that the decision in *Grover vs. Wakeman*, rests, in part at least, on the ground that the law of *New York* does not recognise the right of an insolvent debtor to an absolute discharge from his debts, although he may make a cession of all his property for the equal payment of all his debts. See *Tracy's Opinion*, 11 *Wend.*, 223.

In *Pennsylvania* the decisions have uniformly supported the validity of such preferences. In *Lippincott vs. Barker*, 2 *Binney*, 174, the question is elaborately discussed by counsel, and is pointedly met by the court. The assignment in that case excluded the creditors who did not release. The animadversions of *Mr. Justice Breckenridge* are directed chiefly against such assignments, and in his opinion, a deed merely preferring the creditors who release, would be far less exceptionable. *Mr. Chief Justice Tilghman* could see no good reason, why the creditors who had assented to the assignment in the case before him should not have the benefit of it. Without fatiguing the court by references to the intermediate cases, we may refer to 5 *Rawle*, 221, for a succinct and most conclusive vindication of the right of the debtor to create conditional preferences. At first glance, says *Chief Justice Gibson*, it would seem difficult to reconcile those preferences with the requisitions of the *Stat.* 13 *Eliz.* But the inequality is properly attributable to the general rule, which authorises the debtor in failing circumstances to create any preferences whatever; and it would be more consistent, to declare that the insolvent debtor should be trusteee for the equal benefit of his creditors, and to provide, by a system of coercive bankruptcy, for an application of his estate to the payment of all his creditors.

In *Pierpoint vs. Grahame*, 4 *Wash. C. C. Rep.*, the late

*Judge Washington* had occasion to express his opinion on the subject. He was clear "that an assignment in trust for the benefit of such creditors as should release their debts, is founded on a good and valuable consideration." He approved of the decision in the case of *Lippincott vs. Barker*, already referred to; and likewise of the case of *Butler vs. Rhodes*, 1 *Ep.*, 236, where a creditor was held bound by his assent to a simple agreement for a composition. In his opinion, therefore, the cases in which a composition has been sustained, are authorities in favor of the right of the debtor to exact releases from the creditors he may prefer.

In *Brashear vs. West*, 7 *Peters*, 615, the assignment excluded all creditors who should not, within a limited term, release the grantor. The court was "far from being satisfied, that upon general principles, *such a deed* ought to be sustained." Nothing, however, is intimated in regard to the validity of a deed, which, providing for all creditors, should merely prefer those who released. The tendency of the deed before the court "is to delay creditors. If there be a surplus, this surplus is placed in some degree out of the reach of those who do not release, and thereby entitle themselves under the deed." It did not tend to the delay of creditors thereby provided for. It would not, in the opinion of the court, as understood by us, have tended to the delay of any, if the surplus had been reserved for the creditors who would not release. The court remarks on the circumstances, that the release is to be "induced by the necessity arising from the certainty of being postponed to all those creditors, who shall not accept the terms by giving the release." "Humanity and policy, however, plead strongly in favor of leaving the product of his future labor to the debtor." "This certainly furnishes a very imposing argument against its being deemed fraudulent." And if the inclination of the court would have been against a deed simply giving preferences to the releasing creditors, we are at no loss to conjecture that it would have proceeded on the ground, that the principle of leaving his future labor to the debtor, is not "established by law" in this country. Happily

for the unfortunate in *Maryland*, that principle is a part of our system regulating the relation of debtor and creditor.

It would be tedious and unprofitable to review all the cases which have been adjudged in this country on this subject. We should find in them only repetitions of the views expressed in the cases to which we have already referred. It will be sufficient then to say, that the right of the creditor to prefer conditionally is recognised in *New Hampshire*, 5 *New Hamp.*, 113, *Haven vs. Richardson.* In *Virginia*, 8 *Leigh*, 291, *Skipwith vs. Cunningham.* In *South Carolina*, 1 *Richardson's Eq. Reps.*, 217, *Le Prince vs. Guillemot.* 2 *Hill's Ch'y*, 443, *Niolan vs. Douglas.* And in *Maine*, 5 *Greenlf.*, 245, *Fox vs. Adams.* 6 *Greenlf.*, 395, *Canal Bank vs. Cox.* 2 *Fairf.*, 45, *Todd vs. Bucknam, against the decision in Ware*, 241, *the Brig Watchman.* In Alabama, 2 *Stewart*, 56, *Robinson vs. Rapelye.* 12 *Ala.*, 101, 104. 17 *Verm.*, 311.

In *Connecticut*, the inclination of the courts seems to be against the right, though the facts present cases of deeds providing for the creditors releasing only. 6 *Conn.*, 282, *Ingraham vs. Wheeler;* and also in *North Carolina*, 1 *Iredell*, 490, *Hafner vs. Irwin.* In *Ohio*, the validity of such preferences is denied. 5 *Ohio*, 293, *Atkinson vs. Jordan.* In *Missouri*, which seems to be the only State, besides *New York* and *Ohio*, where the right of the debtor to prefer has been expressly negatived, the authority of the *English* cases is denied on the ground, that the bankrupt laws in that country secure to the debtor the benefit of a final discharge, whilst no such immunity is afforded by the laws of *Missouri*. 6 *Mo.*, 302, *Brown vs. Knox.*

From such contradictory authorities, what rule is to be extracted for the government of the people of *Maryland*. We find no adjudication in our highest court expressly on the point, other than *Albert vs. Winn*, which the court has permitted us to overlook. But we do find that cases have arisen in which the very point was directly presented, and the counsel have failed to discuss it. We know that from the earliest times to which tradition carries us back, down to a very recent period,

the profession have, with common consent, affirmed the validity of those assignments.   And in every commercial crisis, as in the years 1799, 1800, again in 1818, 1819, and again in 1834, the common formula of the assignment contained a stipulation for releases.   The present chief justice of the Supreme Court informs us, that "it was generally understood whilst he was at the bar, and indeed he had not, in his experience as a member of the bar, heard it doubted, that deeds like the present were valid in this State."   We rely then on the common consent of the profession, and the general acquiescence of the community at large, and upon the inconvenience and distress which will be occasioned by opening the question and disturbing the very many titles which have been acquired upon the faith of such opinion and acquiescence, as most persuasive in favor of the validity of such assignments.   We rely further on the general tone of the *English* cases, and on the preponderance of authority in this country, which is yet more increased by excluding from the balance the cases in *New York* and *Missouri,* whose policy in relation to debtor and creditor differs so essentially from our own.

The last argument to which we propose to address ourselves, is derived from the circumstance, that in several States where the validity of conditional assignments has been sustained by the judicial decisions, the legislature has interposed and established a different rule.   In the view which we have been accustomed to take of this subject, those acts of legislative interference are to be treated as amendatory of the law—as acts which give the law for the future, and which confirm the adjudications as correct expositions of law for the past.   Those acts certainly indicate a change of policy as to this subject, on the part of the legislatures by which they have been enacted.   Before they can serve as precedents to be incorporated into our legislation, we should be convinced that the policy of the States by which they have been enacted, in relation to debtor and creditor, is identical with our own.   If they are entitled to any influence, they serve to show that, independently of any statutory regulation, the weight of authority is too strongly in favor

of those conditional preferences to be removed by any other than legislative power.

Upon the whole, we would respectfully conclude:

1st. That the current of *English* decisions is unbroken in favor of the right of the debtor to prefer his creditors releasing him.

2nd. That the great weight of authority in this country, is in the same direction.

3rd. That the allowance of conditional preferences advances the policy of our whole system of law regulating the relation of debtor and creditor; and affords the only effectual means of accomplishing the objects of that system.

The following is a brief note of the opinion delivered by *Chief Justice Taney,* in the case of *White, Warner & Co., vs. Winn and Ross,* in the *United States Circuit* court, upon the very deed decided in the case of *Albert and wife vs. Winn and Ross,* 7 *Gill,* 446, to be void:

"The material part of this case may be thus stated: *Jones,* on the 26th October, 1846, conveyed all his property and effects to *Winn and Ross,* in trust, to pay: 1st. His creditors who should, on or before a certain day thereafter, deliver to the trustees releases of their claims against *Jones.* 2nd. All other creditors. *Jones* was, at this time, insolvent, within the provisions of the act of 1834, ch. 293, and the trustees were aware of his situation. On the 11th January, 1847, *Jones* applied for the benefit of the insolvent laws, and *Winn and Ross* were appointed his permanent trustees, and have duly qualified as such. On the 15th January, 1847, the plaintiffs recovered judgment, in the circuit court, against *Jones,* on which they issued their attachment, and laid the same in the hands of the defendants. *Jones,* after the making of the conveyance before stated, and before his application for the benefit of the insolvent laws, acquired no property. The question, therefore, is, whether the plaintiffs (who are citizens of the State of *Pennsylvania,*) are entitled to the condemnation of the property of *Jones,* which was such at the date of the conveyance before mentioned?

" The chief justice, in delivering the opinion of the court, first addressed himself to the objection made to the conveyance, on the ground that it prefers creditors who should release their claims against the grantor to others who refuse to make such releases. The court, he said, was not prepared to affirm, that preferences of this character are entirely consistent with the principle of the *Statute of* 13 *Eliz.* But they are sustained by the uniform current of *English* decisions. And although the more recent *American* cases are in conflict with each other, it may be safely assumed, that the weight of judicial authority, in this country, is in favor of the right of the debtor, (in the absence of any bankrupt or insolvent law,) by a conveyance devoting his entire estate to the payment of his debts, to prefer creditors who will consent to release him from their claims, to other creditors who will not accept such terms. Such, he remarked, are the conclusions of the late *Chancellor Kent* and *Justice Story*, whose concurrent testimony on the subject deserves the highest consideration. In commenting on the case of *Grover vs. Wakeman,* in 11 *Wend.,* 187, which is the leading authority on the opposite side of the question, he repeated, with approbation, the remark of *Ch. Kent,* that it "appears to be the most stern decision that exists either in *England* or in this country, on the subject." He agreed with *Mr. Justice Story,* in *Halsey vs. Whitney,* 4 *Mason,* 206, that the question is one of local law—to be determined by local decisions, if they exist—and influenced by local practice and local opinions, if such practice and opinions are so uniform as to furnish evidence of the local law. He did not consider the case of *McCall vs. Hinckly,* under the circumstances, as a controlling authority. But it was generally understood, whilst he was at the bar, and, indeed, he had not, in his experience as a member of the bar, heard it doubted, that deeds like the present were valid in this State.

" In view of that general understanding of the profession so prevalent and so long entertained, and, as is believed, frequently adopted in practice—in the absence of any overruling decision by the courts in Maryland—and in deference to the clear

weight of judicial authority elsewhere, this court could not hesitate in sustaining the deed against the objection.

"But the court was also of opinion, that under the state of facts admitted, the conveyance created undue and improper preferences within the intent and meaning of the act of 1834, ch. 203; and that the property and effects thereby conveyed, had vested in the defendants, (garnishees,) as permanent trustees of Jones. And it is next to be considered, whether the property, thus passing into the hands of the permanent trustees, is liable to the attachment of the plaintiffs?

"It is to be assumed, that the plaintiffs, as citizens of *Pennsylvania,* are not bound by *Jones'* application for the benefit of the insolvent laws. They may deny the validity of the pro ceeding. But can they, in the same breath, claim a right, or exercise a privilege which that proceeding, only, has brought into existence? They may assert their remedy against property in the hands of the permanent trustees, over which the insolvent had a control at the time of his application, and which, but for his application, might have been subjected to their execution. But it is not the application of *Jones* which is relied on to protect the property in question from the attachment of the plaintiffs. That property did not belong to *Jones* at the time of his application. It had been conveyed to others by a deed good at the date of its execution, which remained good to the time of his application, and which, but for that application, would have remained good to the present hour. And it is to be observed, that the deed is not made absolutely void. As against all others, than the permanent trustees, *it is yet good;* and the operation of the law in their favor, is to transfer the title to them through the grantees, for the benefit of creditors generally. The plaintiffs, then, are reduced to this dilemma: If they deny the validity of the proceedings, on *Jones'* application for the benefit of the insolvent laws, the deed will afford a sufficient protection against them. If they insist that the deed is avoided by the provisions of the insolvent law, they must claim under the permanent trustees such interest, only, as by that law is awarded to them.

"The conclusion is, that they must elect to be non-suited, or to take a dividend of the fund in hand of the trustees."

MAGRUDER, J., delivered the opinion of this court.

We are required, in this case, to assume, that the deed which furnishes the matter of controversy, was a conveyance of all the property of the grantor, for the purposes therein expressed, and the court is asked to say, that all such deeds are fraudulent, if impeached by creditors not parties to them, although nothing like actual fraud was designed.

The deed is a deed of trust, for the benefit, principally, of such creditors as shall release their claims, but securing the surplus to such as do not release. Can creditors, who have been invited, but refused to participate in the trust fund, on the condition thereto annexed, ask that the deed be declared void, to the prejudice of the rights of other creditors who have released their claims, and thereby acquired a title, each one to his proportion of their trust fund?

In the case of *McCall and others, vs. Hinkley, &c.*, 4 *Gill*, 128, I took occasion to express my opinion of such deeds at some length, and to cite some authorities which induced me to think that deeds like this are valid. I have no disposition again to cite them, or to add to them others. It seems to me, that it is scarcely to be believed that in the courts of *England*, either before or since the *American* revolution, it would have been decided, that deeds of this description were forbidden by any common or statute law.

I might, indeed, dispose of this question, and would dispose of it, satisfactorily to myself, in these few words:—A debtor, though in failing circumstances, has a right given to him by the common law, and which, it has been decided, is, in this particular, our law, to prefer one, or a class of creditors, to others, by paying, or securing the payment of, the debt due to him, or each of them; and the creditor has a right to receive, in full satisfaction of his claim, a lesser sum than is due to him. This common law right of the debtor, no *English* statute before our revolution, nor act of Assembly of *Maryland*, (bankrupt and

insolvent laws are not here to be noticed,) has taken from such debtor; and until our General Assembly thinks proper to deprive such debtor of this power, our courts cannot deny it, because of their notions of sound policy, or of sound morality, or because judges elsewhere may claim a right so to act.

I do not now, for the first time, express my fears of the crying evil which, if it be not checked, must result from the practice so prevalent in our courts, of relying on the decisions of courts in the sister States, and of the *English* courts, since the revolution, as *authorities,* whence we are to learn the law of *Maryland.* In these notions and dreads, I am not singular. A distinguished jurist, (the late *Mr. Duponceau,*) writing upon this subject, asks: "Are we to wait for every spring and autumn ship from *England,* for cargoes of the decisions of the courts of *Westminster Hall?* This would be derogatory to our national independence, and some States have already shown their sense of this proceeding, by prohibiting the reading, in our courts, of the modern *English* adjudications. Or, are we to refer to that mass of decisions which daily issue, in the form of reports, from the presses of the different States?" Of these latter he says, "they are often contradictory, and probably will become more so."

It is true, it is sometimes pretended that the books cited are not relied on as *authorities.* An *English* judge first cited *Phillips on Evidence* for what the law was, and then added: " Which I refer to, not as authority, but as proof of the understanding of *Westminster Hall* on the subject." We cannot say this when citing the decisions of the courts of our sister States, for when it is our duty to learn what is the law of the State in which a decision is pronounced, we are positively forbidden to consult for it, the reported decisions of the courts of such States. It is only when the enquiry is, what is the law of *Maryland?* that such *extra territorial* decisions are cited and relied on.

With respect to the question now to be decided, the evils of regarding the courts of other States as oracles of this branch of *Maryland* law, are greater than in the decisions of very many

questions. In some of the States, the decisions, we are told, (*1st Am. Select Cases, p.* 79,) seem to be grounded upon the difficulties respecting the powers of the courts to compel the trustees to execute the trust, arising from the want of a chancery jurisdiction. It cannot be proper, then, to collect all the decisions of all the courts of all the States, (except those of *Maryland,* as is often the case,) upon the question to be decided and then pick and choose from among them such law as is most approved of by the court. It was, with great propriety, said, by the chief judge of a sister State, that " if we are to take up the decisions of all the States, founded, as they are, upon local customs, colonial necessities, and legislative novelties, and attempt to make them the rule of adjudication, we shall not only disfigure and break down the ancient temple of justice in which we so much glory, but pile up, in its place, a mass of broken fragments, without symmetry, form or beauty. Each of the States adopted some portion; no two of them the same portion of the law of the mother country."

The learned judge might have added, that much of the law of every State, though never to be found in the statute book, is of home manufacture. "Much of the law of every country depends upon established usage. Legislation can only settle principles, while the application of those principles must either be left, in all cases, to the discretion of the magistrate, or must be modified or governed by judicial decisions."

I have thus spoken of the evils which must be the result of using, as authorities *here,* the decisions of the courts of our sister States; not because a majority (indeed it would seem that very few) of them have pronounced such deeds to be void, but because, that but for one or two such decisions which *here* would be regarded as judicial legislation, it is not at all probable that this would ever have been considered an unsettled question in *Maryland.*

The question before us is often regarded (it was so regarded by *Justice Story, 4th Mason,* 206,) as one of those questions to be decided, to be sure, by local decisions, if they exist; but in the absence of any such decisions, to rest, in a great measure,

upon local opinions and local practice, if therefrom evidence can be furnished of such local law. For this reason, in the decision of the case to which I have already alluded, I spoke of the learned judge who pronounced that decision, and the peculiar respect which is due to his opinion, in the decision of such a question. Since that decision, *Chief Justice Taney* has pronounced deeds of this description to be valid. We have, then, the opinion of the three oldest lawyers in our State, (speaking rather as witnesses than as jurists,) whose *localities*, during their unusually long professional lives, enabled them to say with some confidence, that "whilst they were at the bar, it was generally understood, and in their experience as members of the bar, they had never heard it doubted, that deeds like the present were valid in this State."

We have also the further fact made known to us, that in the various periods of great commercial distress, deeds of this description were very common, were approved of, and so far as we can learn, were never contested in this community. This *communis opinio*, then, has been made "the groundwork and substratum of practice;" and the case before us, is one of the cases spoken of by a learned judge, in 3 *Maul. & Sel.*, 316, as evidence of what the law is, and evidence, too, which our courts must regard, or they will deprive our citizens of much that is valuable law. Of this, there is very much, not to be found in our volumes of reports, and not there simply because it was never formerly doubted, but for which we must depend upon "experience and *traditionary* knowledge."

Others, however, may choose to think and reason quite differently, and because our reports furnish us with no express adjudication, may conclude, that the question is to be regarded as *res nova*, and being so, it must, they would tell us, be settled upon *principle*. Perhaps, however, it would be difficult to refer to any legal principle which would authorise a court to deny the validity of such deeds, unless it would choose to make a law, which will take from the citizen the common law right of the debtor, to settle the claim of one creditor, leaving unsatisfied that of others. Even the learned judge, with whose opin-

ion we are furnished in 1*st* *Select American Cases*, 73, (and which is treated as the leading case upon this subject in this country,) while he evidently is not partial to such deeds, and declares, that it is difficult at a glance to reconcile the mind to a decision in support of these conditional assignments in any case, is constrained to admit, that it is not easy to point out a defect in the argument by which they have been sustained, and declared the deed to be valid.

An attempt was formerly made, to distinguish between preferential trusts and preferential payments, in dealing with those deeds: but this mode of assailing them, seems now to be abandoned.

It is said, that such deeds practise upon the hopes and fears of the creditor, and put the property beyond his reach, except on terms prescribed by the debtor. For such reason, deeds of this description are to be declared void in *Maryland*, " although," in the language of *Chief Justice Gibson*, " the immense amount of property held by the title, would make it dangerous *to pause as to the validity of them.*"

If, to use the language of the objection, the hopes and fears of all the creditors are practised upon with success; if all of them assent to the terms *prescribed* by the debtor, then it is universally conceded, that the deed is valid; that neither creditor nor debtor can object to it. And yet, if only one creditor, (no matter how trifling in amount is his claim,) refuses thus to be practised upon, and will not assent to the terms of the deed of trust, he may object, and by objecting, may deprive all the other creditors, (though to a vast amount,) of the fund to which they have consented to look, and insist upon being permitted to look, for their just and undisputed claims. This right of objecting is confined to the creditors, who are not parties to the deed; and if admissible, upon what ground can a similar attempt be resisted, to vacate a mortgage to any of the creditors, if it was prescribed by the debtor as the condition of the deed, that a considerable credit should be given, after the debts were, by the terms of the original contract, due?

The debtor might have conveyed the same property in trust,

to pay every creditor, by name, every debt but that of the objecting creditor; and to such a deed the latter could make no objection, but because the deed enabled him, if he chose, to make himself a party, he acquires by his refusal to be a party, a right to deprive all others of the benefit of it. Surely this cannot be, because his hopes or fears were practised upon. It is certain, that he is not the person to complain of any wrong done to the other creditors.

It is an objection to such a deed, that the terms are *prescribed* by the debtor; yet oftentimes the creditors, themselves, prescribe the terms. Then, too, would the deed be void?

By such a deed, the debtor, instead of placing his property out of the reach of his creditors, deprives himself of all control over it; puts it out of his own power to waste it; while creditors, who, perhaps, have not as yet instituted suits, are seeking to obtain judgments against him. Even the creditors who have refused their assent to the terms of the deed, have an interest in the trust fund, and in a court of equity can compel an administration of it.

We sometimes, indeed, are told, that men in failing circumstances, are under a moral obligation to distribute their property equally among their creditors. Now granting this to be true, it may furnish a reason for changing the law, which it must be admitted allows them to pay one creditor, and to leave another unpaid: but the courts are not to enforce any such obligation.

But in what school is this morality taught? It must be the system of some Shylock! It cannot receive the deliberate sanction of those, who claim a right to believe, that there is some little difference between a heartless creditor, who, in making his bargain, profits by the necessities of his debtor, and gets every advantage which those necessities enable him to obtain, and the noble-hearted benefactor, who, in aiding his debtor in his difficulties, seeks no gain, and could obtain no reward, save only the luxury of doing good. There are, it is true, objections to this right of a debtor, when in failing circumstances, to prefer one creditor and postpone another; but they are of a very different character, and it is not for courts to say what

weight they shall have with those, to whom alone they can be addressed.

Equality, too, it is sometimes said, is equity. Without stopping to enquire whether this, which is called a maxim of equity, is not sometimes misunderstood, it is sufficient here to say, that if it be a maxim of equity, it is not a maxim of law;—and we are now in a court of law. The rule of law which has the sanction of the community, is: "*Vigilantibus non dormientibus, leges subveniunt.*" A maxim not very favorable to those, who, in such cases, are offered, but refuse to take, the dividend which others agree to accept. When such a case occurs in equity, then the maxim of equity, applicable to it, will be: "*Æquitas sequitur legem.*"

If our courts of law or equity be authorised to set aside such arrangements as these, then let the law from which such authority is derived, be produced. An arrangement such as this, in which nothing is done but the adjustment of *bona fide* claims, to the satisfaction of both creditor and debtor, cannot be *malum in se.* Surely it cannot be questioned, that every man who has a legal capacity to make a contract, has a right to dispose of his own property in satisfaction of debts which he honestly owes; unless the arrangement which is made, be forbidden by some law of the land:—not a law of any court's enactment. This prohibition is not to be found in the common law. For the power which, in this case, the court is required to exercise, it seems to be admitted, that there is no legislation, unless it be found in the *statute* 13*th Elizabeth,* or in our insolvent laws.

The *statute of Elizabeth,* unquestionably does not take from the debtor his common law right, to prefer a particular creditor, or class of creditors, to others: it does not interfere with the legal right of the debtor to pay, or secure the payment, of the last cent which he owes to one creditor, before he makes any payment to another. It does not annul every conveyance which may have the effect to hinder and delay other creditors, or acts done with that intent. Hence the decision of the court in the case of *Holbird and Anderson,* 5 *D. & E.,* 235. And also in 3*rd Maul. and Sel.,* 372. See, also, *Newland on Con-*

tracts, 381, *(1st Am. Ed.)* *2nd Starkie on Evidence,* 494, *(7th Am. Ed.,)* for expositions of this statute.

For acts which hinder and delay creditors: See *1st Select American Cases,* 80. 1 *Smith's Select Cases,* 11, 12. Any *fi. fa.,* which one creditor may issue, or a mortgage, which is given by a debtor, will probably have the effect to hinder and delay other creditors.

I shall not examine the various supplements to our insolvent law, declaring under what circumstances a preference given by an insolvent *applicant,* to particular creditors, shall be void. These laws do not interfere with the common law right of debtors, in general, to give a preference; but are restricted to those insolvents, who besides being insolvents, apply for the benefit of the insolvent law.

The various supplements to the act of 1805, furnish an answer entitled to considerable weight, in favor of the validity of the deeds, such as we are speaking of. The act of 1834, chap. 203, sec. 1st, relates to persons, who, at the time of executing any deed whatever, and with intent to prefer any creditor, shall be hopelessly insolvent—"when such insolvent" shall have no reasonable expectation of being exempted from liability, or execution for his debts, without applying for the benefit of the insolvent laws, and afterwards becomes an applicant. In cases like this, the deeds and preferences are only declared void: "provided the creditors shall appear not to have had notice of the condition of insolvency of said debtor." All these supplements are legislative expositions, of the supposed defects of the then existing law. How absurd is all this legislation, if it be already the law of this land, that no insolvent debtor, whether applicant or not, can make such arrangement with one or more of his creditors? Surely the act of 1834, embraces conditional, as well as absolute assignments.

An objection derived from our insolvent system, is, that in those conditional assignments, the debtor *prescribes* terms more favorable to himself than the insolvent law offers to him, upon surrendering up all his property.

It would be difficult to prove, that the debtor, himself, always

*prescribes* to the creditor, the terms of the arrangement; and it will scarcely be insisted, that the creditor ought not to be regarded as a free agent, at liberty to reject, as well as to accept of those terms.   It would seem to be the regular order of proceeding, first, to execute the conditional instruments, and afterwards, those which are absolute.   The terms of the deed may be, and no doubt often are insisted upon, by the creditors.   In such cases is the deed valid, and yet otherwise, if in truth the debtor, and not the creditor, proposes them?

But the terms are more favorable to the debtor, than those which our insolvent law offers to him.   Be it so.   And can this furnish any reason for declaring an arrangement to which both parties consent, to be void?   Was it ever understood, that our insolvent system was designed to prevent debtors from arranging with their creditors, except upon less favorable terms than those which the insolvent laws offered to the former? The insolvent law is made for the relief of persons who are unable to pay their debts, and cannot get from their creditors better terms than *it* offers to them.   If this notion be correct, then the condition of an unfortunate debtor would be deplorable indeed, if there were no insolvent laws.   Then his creditors could not be merciful to him, and however disposed, could not release their claims, upon the surrender of his property.   The insolvent law only subjects to the payment of his debts, property which the debtor afterwards acquires by gift, devise, &c.; whereas, if no insolvent law existed, the law of the land would make property acquired in any way by him, so long as he lives, answerable for his debts.

Will it be argued, that with, or without any insolvent law, creditors may not, if they please, offer to their debtors, terms more liberal than it is in the power of the legislature to offer them?   Every creditor is at liberty to refuse to be thus merciful to his debtor;—but if he chooses to be so, what right have other creditors to object to it?

In the very conclusive argument which has been submitted by the counsel for the appellee, we are furnished with late *English* decisions, which shew, that these arrangements "are

very common;" and it is considered by the courts, "that it would be very injurious to disturb them;" that "such a deed ought not to be avoidable, by any particular creditor not excluded from the benefit of it;" and this was declared by the *English* judges, although reminded, that the condition annexed to the assignment, might " compel the creditor to accede to a composition, which the bankrupt laws could not force him to do." See *The King vs. Watson*, 3rd *Price*, 6.

These things were said in a country which has a bankrupt system, which is designed to *force* an insolvent trader to surrender up his property for the benefit of his creditors; and which, in cases of bankruptcy, admits no right in the bankrupt, under any circumstances, to prefer one, and postpone another creditor. If this be the law in a country, which values highly its bankrupt system, *a fortiori*, must it be the law here, where men are permitted, but never compelled by the law, to seek the relief which our insolvent laws offer to them.

I have however thought it best to rely, upon what I insist has been from time immemorial, our own understanding of our own law upon the subject, rather than upon any decision, in regard to the validity of such conditional assignments, expressed elsewhere. Entertaining, myself, no doubt, that such instruments have always been considered valid in *Maryland;* believing that now to decide otherwise, would destroy the title to much property which has been purchased, and the title to which, depends upon the validity of deeds of this description, I cannot feel over-curious to know, what would be the decision of this question, if it were to be decided elsewhere.

In the course of the last half of a century, many periods of great commercial embarrassment have been known in this State, and many deeds like this have been executed. In most arrangements like this, there will be some creditors, who will be dissatisfied with terms of which others approve; and if there had been any distinguished lawyer of former days, who doubted the validity of such assignments, those doubts, and those dissatisfactions, would have given rise to litigation, which could only have been determined by a decision of the court of last resort.

Kettlewell *vs.* Stewart.—1849.

I shall dispose of the subject with a remark, which has been met with:—"Vastly important it is, to the well-being of this community, that in the decisions of our courts, this *ancient and traditionary knowledge of the law*, should not be lost sight of; and that our judges be not at liberty to select at random, from *American* and recent *English* reports, the doctrines that may suit their momentary fancy."

I am for an affirmance of the judgment.

CHAMBERS and SPENCE, J., concurred.

MARTIN and FRICK, J., dissented.

DORSEY, C. J., did not sit in this cause.

JUDGMENT AFFIRMED.